696 So.2d 326 (1997)
Ronnie JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 79383.
Supreme Court of Florida.
May 8, 1997.
Rehearing Denied July 1, 1997.
*327 John H. Lipinski and Maria Brea Lipinski, Miami, for Appellant.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Ronnie Johnson. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm both his conviction of first-degree murder and the death sentence subsequently imposed.[1]
The record reflects the following. Tequila "Sugar Momma" Larkins was the owner of the Sparkle City laundromat in Perrine, Florida. She had owned the facility for at least three years prior to her murder. On March 11, 1989, Larkins locked the front door of the laundromat around 9 p.m. Jerry Briggs and his wife were still finishing their laundry. Eric Bettle, the attendant, and Walter Daniel Hills, Larkins' stepson, were also present. Thereafter, a man came to the locked front door asking for change. Larkins went and got her keys. She unlocked the door. A black man then barged in and started arguing with Larkins. The two started physically fighting. The man was hitting Larkins very hard in her face. Larkins fell. The man got on top of her. He pulled out a gun. Mr. Briggs heard gunshots and felt lead hitting his foot. Larkins died.
*328 In court, Mr. Briggs identified Ronnie Johnson as the perpetrator of the crime. Prior to the in-court identification, Mr. Briggs had identified Johnson in a photographic lineup on April 1, 1989. At the earlier identification session, Mr. Briggs wrote on the back of the photograph he chose that he was eighty percent confident that the photograph reflected the black man he witnessed at the laundromat. At trial, however, Mr. Briggs testified that he was sure that the photograph reflected the culprit. On cross-examination, it was revealed that the prosecutor had reviewed the photographic lineup with Mr. Briggs one week prior to trial. Then, on redirect, Mr. Briggs clarified that the prosecutor did not influence his choice of photographs at the pre-trial review session. The defense moved for a mistrial because the pre-trial review session had not been disclosed. The motion was denied.
In addition to the identifications, Johnson confessed. Prior to trial, though, he moved to suppress the confession.[2] A hearing on the motion was held on June 28, 1991. A total of five persons testified at the hearing. The defense called Johnson. The State called Milton Hull, Gregg Smith, Thomas Romagni, and Danny Borrego.
Officer Hull testified that he found Johnson on his grandmother's porch eating a hot sausage on April 1, 1989. Hull called Johnson over to him. It was a little after 6 p.m. Hull told Johnson that some investigators wanted to talk to him about a murder. If Johnson was willing, Hull would take him to the investigators and bring him back. Actually, however, other detectives transported Johnson after he agreed to go. Hull testified that Johnson was not handcuffed when he was transported. Detective Gregory Smith also testified that Johnson was not handcuffed when he was transported to the Team Police Office. At that point, Johnson signed a Metropolitan Dade County Police Department Miranda[3] warning form. Detective Thomas Romagni testified that he witnessed Johnson sign this form. Romagni stated that Johnson was not handcuffed when the Miranda form was read to him. Detective Danny Borrego then testified that, prior to the signing of the Miranda form, he ascertained that Johnson understood the English language, could read, and was not under the influence of drugs or narcotics. In sum, all four officers expressly testified that they neither threatened Johnson nor promised him anything. On the other hand, Johnson testified that he was handcuffed while being taken to headquarters. He also said that he was told he could avoid the electric chair by cooperating. Johnson stated that he was punched in the chest and arms by investigators during the questioning. Johnson testified that he asked to speak with his family. He says that he was told he could do so only after "what they were doing was over with." Further, he testified that he was scared for his family when he signed the sworn statement.
The motion to suppress was denied. The confession revealed the following. After signing the Miranda form at 7:30 p.m., Johnson gave the sworn statement at 1:43 a.m. on April 2, 1989. The statement concluded at 3:45 a.m. on the same day. Daylight savings time added one extra hour to the length of the statement. Therefore, the one hour statement appears to be two hours long.
The sworn statement indicates that Johnson was approached by an individual named "G" and asked to shoot somebody. Johnson stated that he went to G's house prior to the murder. At that point, G gave Johnson a gun. Johnson then went to the laundromat with G and another "stake out" person. After barging into the laundromat, Johnson recalls that he "got nervous" and "the gun went off." Then he "just got confused" and tried "to shoot my way out of there." Johnson stated that G paid him "about $300 or $400" for the murder. Finally, Johnson agreed that he was not threatened or coerced to give the statement and that the statement was free and voluntary.
*329 Additionally, Termain Tift testified that Johnson told him about shooting Sugar Momma at a washhouse. Tift also said that Johnson admitted getting paid for the murder. Other testimony was offered that no money was taken from the laundromat.
After trial, the jury convicted Johnson of first-degree murder. The jury then recommended the death penalty by a margin of nine to three. On December 13, 1991, the trial judge sentenced Johnson to death. The trial judge found the following five statutory aggravators: (1) the defendant was previously convicted of a felony involving the use of violence to the person;[4] (2) the defendant knowingly created a great risk of death to many persons;[5] (3) the murder was committed while the defendant was engaged in the commission of a burglary;[6] (4) the murder was committed for pecuniary gain;[7] and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[8] The trial judge expressly considered, and thereafter rejected, the following two statutory mitigators: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;[9] and (2) the age of the defendant at the time of the murder.[10] Finally, the trial judge found that the fact that Johnson was a good friend and a caring family man was established by competent evidence. The trial judge treated this as a nonstatutory mitigating factor. He found, however, that this factor was outweighed "to the point of obliteration" by the aggravating circumstances.
This direct appeal ensues. Johnson raises six issues in this appeal. He claims that: (1) the trial court erred in denying his motion to suppress; (2) the trial court erred in striking juror Williams for cause; (3) the trial court erred in denying a motion for mistrial based upon a Richardson[11] violation; (4) the trial court erred in denying a motion for mistrial based upon unauthorized note-taking by the jury; (5) the prosecution's closing argument was improper; and (6) the trial court erred in finding that Johnson created a great risk of death to many persons.
As his first issue, Johnson claims that his confession was not voluntary and therefore should have been suppressed. Specifically, he claims that his confession was involuntary for four reasons. He asserts that he was promised leniency (in the form of avoiding the electric chair) if he cooperated and confessed. He further argues that he was unduly influenced by the duration of his isolation and the lack of communication with his family. He also claims that he was physically abused and threatened by the law-enforcement officers. Finally, he argues that the trial judge failed to make specific findings of fact in his denial of the motion to suppress. In particular, the trial judge allegedly failed to make a specific finding of voluntariness.
It is well established that a confession cannot be obtained through direct or implied promises. In order for a confession to be voluntary, the totality of the circumstances must indicate that such confession is the result of a free and rational choice. Leon v. Wainwright, 734 F.2d 770, 772 (11th Cir. 1984) It may not be obtained by either implied or direct promises. Bram v. United States, 168 U.S. 532, 542-3, 18 S.Ct. 183, 186-7, 42 L.Ed. 568 (1897); Harris v. Dugger, 874 F.2d 756, 761 (11th Cir.1989); Thomas v. *330 State, 456 So.2d 454, 458 (Fla.1984), postconviction relief granted on other grounds, 546 So.2d 716 (Fla.1989); Brewer v. State, 386 So.2d 232, 235-6 (Fla.1980). In this case, though, we can find no support for Johnson's assertions outside of his own self-serving statements. Indeed, his current position is even inconsistent with his own prior statements. In particular, Johnson agreed to answer questions after being read his Miranda rights. He signed a Miranda form reading, in part, that "[t]his statement is signed of my own free will without any threats or promises having been made to me." At the conclusion of his sworn confession, Johnson agreed that the statement had been given "freely and voluntarily" and that he had not been "threatened or coerced." Further, we note that Johnson's booking photograph shows no signs of physical abuse. Moreover, he did not seek medical treatment for injuries received during these alleged "beatings." There is simply an absence of any extrinsic evidence to indicate that Johnson's confessions were the result of threats, duress, coercion, or promises.
Consequently, we must look to the actual testimony given at the suppression hearing by Johnson and the four officers. As we have already stated, Johnson's statement at the hearing was materially different from his sworn confession. It was also at odds with the consistent testimony of every other witness (all four officers) at the hearing. In fact, Johnson claims that he was promised that he could avoid the electric chair if he cooperated. Officers Hull, Smith, and Romagni all expressly testified that no threats or promises were made to Johnson during their respective interactions with him. Detective Borrego likewise testified that no promises or threats were made during the course of the questioning and confession. Borrego also stated that Johnson was not hit or abused in any way throughout the course of the evening. In fact, Borrego specifically testified that Johnson was not even told that he could face the death penalty for the crimes under investigation. We have, in the past, upheld the admission of confessions in situations where the defendant's testimony was inconsistent with the testimony of every other witness at the suppression hearing. Maqueira v. State, 588 So.2d 221, 223 (Fla. 1991) (upholding admission of confession where defendant's testimony was inconsistent with all other testimony at suppression hearing); McDole v. State, 283 So.2d 553, 554 (Fla.1973) (opining that where the only evidence is the contradictory testimony of the officers and the defendant, a finding of voluntariness may be considered supported by a preponderance of the evidence). Unlike the situation in McDole, where extrinsic evidence indicated that McDole had recently been beaten and a confidential informer stated that he was told that McDole had, indeed, been battered into confessing, there is no extrinsic evidence in this case to indicate that Johnson was given promises or suffered physical abuse.
Johnson also claims that his confession was given because he was scared for the safety of his family. He says that his fear for his mother was based on a prior incident "when the police officers came and kicked in the house, the wrong house, and take [my mother], she was asleep." He further claims that he was not allowed to contact his family until after he was booked. At that time, he says, he found out that his family had been trying unsuccessfully to reach him. Borrego, on the other hand, testified that he did not recall Johnson ever asking to phone his mother, grandmother, or any other member of his family. At bottom, there is no allegation that any officer involved in this investigation threatened any member of Johnson's family. Any apprehension that he felt was self-induced. We have previously stated that "[t]o render a confession inadmissible, however, the delusion or confusion must be visited upon the suspect by his interrogators; if it originates from the suspect's own apprehension, mental state, or lack of factual knowledge, it will not require suppression." Thomas, 456 So.2d at 458.
In this case, we find no extrinsic evidence of physical abuse or improper promises, we find that Johnson's testimony at the suppression hearing is at odds with the consistent testimony given by Hull, Smith, Romagni, and Borrego, and we find that any delusions suffered by Johnson as to the safety of his family were self-induced. We have repeatedly *331 stated that, in these situations, we review the record in the light most favorable to the prevailing party. Johnson v. State, 660 So.2d 637, 642 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Wuornos v. State, 644 So.2d 1012, 1019 (Fla.1994). Accordingly, we find that the evidence is sufficient to conclude that the State demonstrated by a preponderance of the evidence that Johnson's confession was voluntary. See Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (holding that state has burden of demonstrating voluntariness of confessions by preponderance of evidence); Balthazar v. State, 549 So.2d 661, 662 (Fla.1989); DeConingh v. State, 433 So.2d 501, 503 (Fla.1983); Brewer, 386 So.2d at 236; McDole, 283 So.2d at 554.
In the fourth aspect to this issue, Johnson claims that the trial judge failed to make specific findings of fact in his ruling on the motion to suppress. According to Johnson, McDole requires the trial judge to specifically set forth the facts upon which he bases his decision. In this case, the trial judge failed to make a specific finding of voluntariness. Johnson asserts that such a failure constitutes reversible error. We disagree. In Antone v. State, 382 So.2d 1205 (Fla.1980), we explained that McDole had been modified. We stated:
This Court, however, has modified the strict requirement that an express finding must appear in the record. See Wilson v. State, 304 So.2d 119 (Fla.1974); Henry v. State, 328 So.2d 430, 431 n. 1, (Fla.) cert. denied, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976). Ideally, the trial judge should specify his conclusions concerning the voluntariness of a disputed confession or inculpatory statement. However, due process is not offended when the issue of voluntariness is specifically before the judge and he determines that the statements are admissible without using the magic word "voluntary."
Id. at 1212-13 (footnote omitted). The modification of McDole discussed in the excerpt from Antone has been applied numerous times both by this Court and the district courts. E.g., Hoffman v. State, 474 So.2d 1178, 1181 (Fla.1985); Peterson v. State, 382 So.2d 701, 702 (Fla.1980); Smothers v. State, 513 So.2d 776, 777 (Fla. 1st DCA 1987); Williams v. State, 397 So.2d 1044, 1045 (Fla. 4th DCA 1981). In this case, it is clear that the issue of voluntariness was specifically before the court. The record, with unmistakable clarity, supports the conclusion that the trial judge found, by a preponderance of the evidence, Johnson's statement to be voluntary. In sum, we find no error in the denial of Johnson's motion to suppress.[12]
As his second issue, Johnson claims that the trial court erred in striking juror Williams[13] for cause. The following exchange took place between juror Williams and the prosecution during voir dire.
MR. BAGLEY: That you would have to sit in judgment, first of all, just in the first part of the trial, determining the guilt or innocence of the defendant, let alone going to the second part of the trial and making a recommendation to His Honor as to the appropriate sentence.
What I need to know is will you be able to, based upon the oath you are going to take as a juror, to meet that responsibility?
MRS. REISINGER: Yes.
MR. BAGLEY: How about you Mr. Williams?
[MR.] WILLIAMS: I prefer not.
MR. BAGLEY: You prefer not to sit as a juror and make a recommendation for the imposition of the death penalty.
Is that what you are saying?
[MR.] WILLIAMS: Right.

*332 MR. BAGLEY: Is that based upon philosophical, religious, or moral grounds?
[MR.] WILLIAMS: In the Bible it says, Thou shall not kill.
So I don't think I would want to go along with the program.
MR. BAGLEY: So are you saying you are opposed to the imposition of the death penalty?
[MR.] WILLIAMS: Yes.
MR. BAGLEY: It doesn't matter what type of case is presented as to aggravated and mitigating factors.
For example, if the State presented the aggravating factors that show this first degree murder is worse than other types of first degree murder cases you would not be able to consider that, and [in light] of the mitigating factors impose the death penalty?
[MR.] WILLIAMS: It depends on how it goes.
MR. BAGLEY: But what I am trying to understand is what you are saying, that you are [opposed] to the death penalty because the Bible says you shall not take a life.
[What] I am giving is a synopsis.
That is what you are saying on one hand, but on the other hand, but I can listen to what the aggravating factors are as well as the mitigating factors and if I think the aggravating factors outweigh the mitigating factors then I can recommend the death penalty?
[MR.] WILLIAMS: I didn't say that.
I prefer not.
MR. BAGLEY: What I am trying to find out for certainI am not trying to put words in your mouth. I know you prefer not to, you may prefer not to be here, you may prefer to be at work or at home.
I think you said you were retired.
The question is, maybe you prefer to be somewhere else.
I am sure if you are selected as a juror based upon your oath you are going to judge the facts and apply the law given by His Honor and arrive at a lawful verdict.
What I need, even though you may prefer not to recommend the death penalty, would you be able to do so?
MR. WILLIAMS: No.
MR. BAGLEY: You would not be?
[MR.] WILLIAMS: No.
The trial court then excused Mr. Williams for cause. Although the defense did object, no effort to rehabilitate was made. The simple act of a juror, in unfamiliar surroundings, solidifying his reasoning through the course of questioning, cannot be labeled equivocation. Mr. Williams indicated at the outset of his questioning that he preferred not to sit on a capital jury. He ended his testimony by twice affirming that he would be unable to recommend the death penalty. There is no question that Mr. Williams made unmistakably clear his inability to be impartial about the death penalty. The trial judge did not abuse his discretion in excusing Mr. Williams for cause in this case. See Hannon v. State, 638 So.2d 39, 41-2 (Fla.1994); Johnson v. State, 608 So.2d 4, 8 (Fla.1992).
As his third issue, Johnson claims that the trial court erred in denying Johnson's motion for mistrial once it was learned that the State failed to disclose to the defense a meeting that the prosecutor had with Mr. Briggs in the week prior to trial. Specifically, eyewitness Mr. Briggs was able to pick Johnson out of a photograph line-up conducted in temporal proximity to the crime. At that time, though, he qualified his identification with the statement "[t]his guy that I am sure 80 percent was wearing a hat so that knocked out 20 percent." The qualification was memorialized on the back of the photograph. The line-up and the qualification were properly disclosed to the defense. A review session held in the week prior to trial, though, gives rise to Johnson's claim. In that review session with the prosecutor, eyewitness Mr. Briggs looked again at the photographic line-up. Then, at trial, eyewitness Mr. Briggs affirmed that he was "sure today that that was the person [he] saw in the Sprinkle City Laundromat striking Sugar [Momma] and pull out a gun." Johnson claims that the disparity between the "80 percent" testimony from the original identification and the certainty at trial was the *333 result of the pre-trial review with the prosecution. The existence of such a review was not revealed to the defense. Based on the alleged discovery violation, the defense moved for a mistrial. The trial judge held a Richardson[14] hearing. After listening to arguments from both the defense and the State, the trial judge concluded:
Taking a look here at the Bush [v. State, 461 So.2d 936 (Fla.1984) ] decision and reconsidering, I will deny the motion for mistrial.
I am not sure a Richardson [v]iolation occurred here since all that transpired at the pretrial conference that Mr. Bagley had [had to do] with showing him the photographs and telling him to look at it.
The Bush case, cited by the trial judge, indicates that "unlike failure to name a witness, changed testimony does not rise to the level of a discovery violation and will not support a motion for a Richardson inquiry." Bush, 461 So.2d at 938. The rationale behind such a rule is that "[w]hen testimonial discrepancies appear, the witness's trial and deposition testimony can be laid side-by-side for the jury to consider. This would serve to discredit the witness and should be favorable to the defense." Id. Certainly the defense in this case had every opportunity to impeach the trial testimony of Mr. Briggs. Further, our reading of the record does not definitively indicate that Mr. Briggs changed his level of certainty at the pre-trial review session. There certainly was no effort to alter, erase, or add to the comments written on the back of the photograph in 1989. The extent of the photo line-up review, according to the record, is indicated by the following exchange on redirect examination. Mr. Briggs testified:
Q [State]: When I presented this photographic line-up to you did I ever point to a photograph number three?
A: No, sir.
Q: What did I ask you to do when I presented that photographic line-up to you?
A: To pick out the guy that I think was in the Laundromat at that time.
Q: And by the way, did you pick out the person you believe was the person who shot Sugar [Momma]?
A: Yes, sir.
Q: And when you did that did you ever look on the back of these photographs first to see if your signature was there before you picked out the person in this photograph?
A: No, sir.
In view of the specific circumstances of this case, we find no error in the trial judge's denial of the motion for mistrial.
As his fourth issue, Johnson claims that the trial judge erred in denying his motion for mistrial based upon unauthorized notetaking by some jurors. In particular, the record reflects that after examination of the final prosecution witness, the following exchange took place between the prosecutor and the judge. The prosecutor stated:
MR. BAGLEY: Judge, recently as I was standing up doing direct examination of the witness, I possibly saw one of the jurors maybe taking notes, and to avoid those notes being taken home or used in any way I don't know what the Court wants to do. I wanted to bring it to the Court['s] attention.
THE COURT: I think what we will do, we will inquire of the jury of taking notes and have them surrender what notes they have taken. They can have them back at the end of the trial.
MR. BADINI: Okay.
....
THE COURT: Ladies and gentlemen, what we are going to do, step inside the jury room for a few minutes.
Before we do that, has anybody been taking notes on any of the testimony?
We have a couple of people here and it is my fault for not saying so earlier. You are not permitted to take notes.
What I am going to do, Mr. Gonzalez, if you can surrender the notes to Mr. Gonzalez he will give them back to you at the end of the trial, but you are not allowed to take notes.
*334 Prior to closing arguments the trial judge again inquired as to whether any notes had yet to be relinquished. It is abundantly clear that no notes were allowed in the jury room once deliberations started. We have stated that the decision as to the propriety of notetaking is within the sound discretion of the trial judge. Kelley v. State, 486 So.2d 578, 583 (Fla.1986). Accordingly, we find that the trial judge in the instant case was well within his discretion to resolve the matter as he did. There is no error demonstrated.
As his fifth issue, Johnson claims that a prosecutorial comment denied him a fair trial. In particular, Johnson argues that a statement made by the prosecutor during closing argument implies that Johnson had the intention of committing another murder. The prosecutor said:
Basically [Mr. Briggs] described the defendant, but he doesn't give you a full description of the defendant until the point when that door is opened and that defendant burst in and start[ed] punching on Tequila Larkins. Because his eyes were fixated.
What was the other thing he said?
He said look, I went into a shock, this thing happened so unexpectedly.
By the way, when something is happening so quickly, so unexpectedly, do you immediately jump and run to the assistance of someone in a situation like that?
Frankly I think Mr. Briggs is very fortunate that he did not because he may not have been here this week to testify.
(Emphasis added.) It must be understood that the closing argument of the defense attempted to discredit Mr. Briggs by demonstrating that he had no concern for the victim. Thus, the State was simply providing a brief response once the defense "opened the door." In the context of the entire prosecutorial closing argument, we find this one sentence to be both minimal and appropriate. There is no error.
As his final issue, Johnson claims that the trial judge improperly found, as a statutory aggravator, that Johnson created a great risk of death to many people. In his sentencing order, the trial judge wrote:
Four people, plus Tequila Larkins, were in the laundromat when the Defendant broke in and began shooting. People were forced to hit the floor and take whatever cover was available. Sixteen bullet fragments were later found in the laundromat. In his confession, the Defendant admitted that he was at one point trying to shoot his way out. At least one witness stated that he could feel shots hitting near his feet as he lay crouched on the floor. Unquestionably, the Defendant created a great risk of death to many persons.
After reviewing the record, we agree that it supports this aggravator. Walter Hills, Eric Bettle, Jerry Briggs, and Valerie Briggs were all in immediate risk of death. Our case law supports the application of this aggravator in similar circumstances. See Fitzpatrick v. State, 437 So.2d 1072, 1077 (Fla. 1983) (holding a great risk of death to many was demonstrated where defendant shot at two nonvictims and held two other nonvictims at gunpoint), habeus corpus granted on other grounds, 490 So.2d 938 (Fla.1986). Accordingly, we find no merit in this claim.
For the reasons expressed, we affirm Johnson's conviction of first-degree murder and the death sentence subsequently imposed.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Ronnie Johnson faces another death sentence in case No. 80,278. In that case, he was convicted of murdering Lee Arthur Lawrence. Both cases involve murders-for-hire.
[2] While Johnson was tried separately for the murders of Tequila Larkins and Lee Arthur Lawrence, a single hearing was held on the motion to suppress Johnson's confession to both murders.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] § 921.141(5)(b), Fla.Stat. (1987).
[5] Id. § 921.141(5)(c).
[6] Id. § 921.141(5)(d).
[7] Id. § 921.141(5)(f).
[8] Id. § 921.141(5)(i).
[9] Id. § 921.141(6)(b). The trial court could not understand how Johnson's grief would lead him to become a hired killer and, therefore, stated that there was insufficient evidence to support this mitigator.
[10] Id. § 921.141(6)(g). The trial court rejected the notion that a twenty-two-year-old man had not acquired the moral sense to recognize the horrifying nature of murder for hire. In truth, however, Johnson, was only twenty-one at the time of the murder. He was born on July 13, 1967, and the murder was committed on March 11, 1989. This discrepancy, though, does not alter the validity and trustworthiness of the judge's decision.
[11] See Richardson v. State, 246 So.2d 771 (Fla. 1971).
[12] We note that the transcript memorializes the judge's ruling as being "[n]othing suggests a waiver of the constitutional rights." This statement directly follows the denial of the motion to suppress. Context dictates that this is simply a scrivener's error.
[13] The venire consisted of two members named Williams. Nancy Williams actually served on the jury and Mr. Williams was excused for cause. The transcript would indicate, at some locations, that Mrs. Williams was the venireman indicating reservations about the death penalty. A close reading, however, demonstrates that Mr. Williams was dismissed for cause.
[14] See Richardson v. State, 246 So.2d 771 (Fla. 19711.