707 So.2d 674 (1998)
Paul HOWELL, Appellant,
v.
STATE of Florida, Appellee.
No. 85193.
Supreme Court of Florida.
February 12, 1998.
*676 Nancy A. Daniels, Public Defender; and Robert A. Norgard, Bartow, for Appellant.
Robert A. Butterworth, Attorney General and Richard B. Martell, Chief, Capital Appeals, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Paul Howell. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In January of 1992, Howell constructed a bomb for the specific purpose of killing Tammie Bailey at her home in Marianna, Florida. Bailey, Howell, and Howell's brother, Patrick, were part of a drug ring involving a number of other individuals in which drugs were obtained in Fort Lauderdale and then sold in Marianna, Florida. Howell intended to eliminate Bailey as a witness because she had knowledge that could link Howell and his brother to a prior murder. The bomb was placed inside a microwave oven and then the oven was gift-wrapped. Howell paid Lester Watson to drive and deliver the microwave to Bailey. Although he knew that Howell had often made pipe bombs, Watson testified that he thought the microwave contained drugs. Howell rented a car for Watson to use for the trip. Watson was accompanied on the trip by Curtis Williams.
While traveling on I-10 toward Marianna, Watson was stopped by Trooper Jimmy Fulford for speeding. Fulford ran a registration check on the car and a license check on Watson, who gave the trooper a false name and birth date because he did not have a valid driver's license. The radio dispatcher contacted the car rental company and was informed that Howell had rented the car. The dispatcher contacted Howell at his home in Fort Lauderdale, Florida, to determine whether the rental car had been stolen from him. Howell told the dispatcher that he had loaned the car to Watson but did not know that Watson would be traveling so far with the vehicle. Howell was informed by the dispatcher that Watson was going to be taken to the Jefferson County Jail. Howell did not give any warning to the dispatcher regarding the bomb.
Deputies Harrell and Blount of the Jefferson County Sheriff's Department arrived at the scene and Watson gave them permission to search the vehicle. Trooper Fulford and the deputies observed the gift-wrapped microwave in the trunk of the car. Watson was arrested for speeding and driving without a valid driver's license and was transported, along with Williams, to the jail by Deputy Blount. Deputy Harrell also proceeded to the jail, leaving Trooper Fulford alone with the rental car. Shortly thereafter, a massive explosion took place at the scene. Testimony presented at Howell's trial by the State's explosives expert indicated that Trooper Fulford had been holding the microwave in his hands when the bomb went off. Trooper Fulford died instantly due to the massive trauma caused by the explosion.
Howell was arrested and charged with Trooper Fulford's murder. Frank Sheffield, a private attorney, was appointed to represent Howell due to a conflict of interest asserted by the Public Defender's Office for the Second Judicial Circuit. Venue of the trial was transferred from Jefferson County to Escambia County.
The jury found Howell guilty of first-degree murder and of making, possessing, placing, *677 or discharging a destructive device or bomb. The jury also returned a special verdict finding that the charge of first-degree murder was established by both proof of premeditated design and felony murder. At the penalty phase, the jury recommended death by a vote of ten to two. The trial court found that the following aggravators applied to the murder: (1) Howell knowingly created a great risk of death to many persons; (2) the murder was committed while Howell was engaged in the unlawful making, possessing, placing, or discharging of a destructive device or bomb; (3) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (4) the victim was a law enforcement officer engaged in the performance of his official duties; and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court also found that the following statutory and nonstatutory mitigators applied: (1) Howell had no significant history of prior criminal activity; (2) the murder was committed while Howell was under the influence of extreme mental or emotional disturbance (given little weight); (3) Howell had served in the military and received an honorable discharge (given little weight); (4) Howell displayed good behavior as a pretrial detainee; and (5) Howell was a good family man (deemed inconsequential). The trial court found that the enormity of the proved aggravating circumstances far outweighed the mitigating circumstances and imposed the death penalty in conformance with the jury's recommendation that Howell be sentenced to death. The trial court declined to impose a sentence on Howell's conviction for constructing the bomb because this charge and the murder charge both arose from a single underlying offense.
Howell raises one guilt-phase issue and eight penalty-phase issues on appeal.

THE GUILT PHASE
Howell's only point on appeal with reference to his conviction is his contention that the trial court erred in refusing to appoint different counsel for him and in refusing to appoint a second attorney. The facts surrounding this claim are set forth below.
Because of a conflict of interest asserted by the public defender's office, attorney Frank Sheffield was appointed to represent Howell in the defense of this case. Howell also faced federal charges arising out of much of the same conduct which had given rise to the State's indictment. Sheffield had also been appointed to represent Howell in defense of the federal charges. On March 18, 1993, the state attorney moved to disqualify Sheffield from this case, noting the fact that Sheffield had been allowed to withdraw from the federal prosecution. Three days before, Howell had written to the judge complaining that Sheffield had failed to communicate with him and that he wanted William Pfeiffer, who had replaced Sheffield during the federal trial, to serve as his counsel in state court and asked that attorney Clyde Taylor be appointed to assist Pfeiffer. At the hearing, the prosecutor stated that the State's motion was not predicated upon any belief that Sheffield was not rendering effective assistance but rather had been filed to bring to the court's attention that he had been relieved from representing Howell in federal court. Sheffield explained that he had received a telephone threat during the federal trial and that he had requested leave to withdraw, which had been granted. With respect to the current representation, Sheffield stated:
I am perfectly willing to continue representing Mr. Howell in this state case. I have tons and tons of discovery. We have taken depositions. I have no qualms whatsoever about my reputation as far as my abilities to represent him. I have handled over a dozen death cases. I have the experience in handling death cases, and I am more than willing to continue representing him. I see no reason why there should be a change at this point.
Judge Davey, who was then presiding over the case, asked Howell his views, and Howell stated that he did not want Sheffield to represent him because he had not shared discovery matters with him. After further examination of Sheffield's performance, the court stated that it was satisfied that Sheffield had *678 not been removed from the federal case due to any lack of diligence, that it found no basis to question his performance in the instant case, and noted that attorney Pfeiffer had no experience in capital cases.
On June 4, 1993, the State filed a motion for rehearing, attaching partial transcripts of the federal proceeding. However, this motion was not called up for hearing until November 19, 1993, at which point Judge Steinmeyer was presiding over the case. The prosecutor explained that the transcripts shed further light on the telephone incident which indicated "an apparent conflict" and that he felt that the court should inquire further of Sheffield and Howell in this respect. Sheffield then recounted some of the difficulties he had encountered during the federal proceeding and stated that under the federal practice during the trial he had been continuously served with new discovery but that Mr. Howell would not communicate with him concerning these matters, and their relationship became strained. At this point, Sheffield had obtained a psychological evaluation of Howell. The doctor reported that he was not incompetent to proceed, but that because of some perceived problem that Howell had with Sheffield at that point, he had a problem communicating with Sheffield. However, U.S. District Judge William Stafford denied Sheffield's motion to withdraw as counsel, indicating that he did not believe there were sufficient grounds to remove him. Sheffield went on to explain that on the following day his wife received a phone call at Sheffield's office from an unknown source in which the caller said that "if Paul Howell goes down, Mr. Sheffield is going down too." Sheffield explained that when he brought this to Judge Stafford's attention, the judge granted his motion for discharge. Sheffield then stated:
Since that time Mr. Howell and I have communicated with one another. He has communicated with me in this case. This is not a case where there are [Jencks] Act rules that you have to deal with and that you don't get discovery in. We are getting discovery. We have taken depositions. I have visited him in the Broward County Jail. We have no problems between us with me continuing to represent him in this case, and the problems that were occurring at that time in the federal case no longer exist.
Secondly, I am not concerned at this point in time that there is somebody out there coming to get me. I have had threats before. I am sure I will have threats again. I am perfectly willing to continue on this case to represent Mr. Howell and to represent his best interests in this case.
....
So I certainly have no problem continuing to represent Mr. Howell. I have been working in this case since the beginning; and certainly from the standpoint of continuing with the case from the judicial perspective, there will be a substantial delay if new counsel is put in because they are going to have to come up to speed on everything that has been going in this case. We have been down to at least two week-long sessions taking depositions in it. I have prepared motions and have worked with the other counsel in the case. I see nothing to be gained from the standpoint of pursuing this case by changing counsel. I don't think that Mr. Howell at this point wants to change counsel. So I think it's a moot point.
The state attorney then sought an affirmative representation from the defendant with respect to whether to remove Sheffield from the case. Upon being sworn, Howell said that he wanted to hear about the results of the investigation regarding the bomb threat because his wife and mother had been upset by insinuations that they had precipitated the threat. A special agent of the U.S. Drug Enforcement Administration then testified that he had investigated the threat but was unable to substantiate from the phone records that a telephone call had been made to Sheffield's office at the time it was reported. When interrogated by Sheffield, the agent expressed the opinion that his wife had either falsified the bomb threat or that there was a mistake in the company's computer system. When asked his position with respect to Mr. Sheffield, Howell expressed concern over the allegation of the bomb threat *679 should it happen again. At this point, the following colloquy occurred:
THE COURT: The point is, is there any problem between you and Mr. Sheffield? If there is no problem between you and Mr. Sheffield, it makes no difference to me what the problem is between Mr. Sheffield and the Drug Enforcement Agency.
DEFENDANT PAUL HOWELL: That matter has not been resolved yet.
THE COURT: Right.
DEFENDANT PAUL HOWELL: Until somebody announces it never happened, it's still a problem.
THE COURT: Well
MR. SHEFFIELD: Judge, I can tell you that if it is a problem, it is only a problem with Mr. Howell because I can represent to this Court that I intend to represent Mr. Howell, as I have told him, to the fullest extent that I can possibly do so, to whatever it takes. And I have already indicated on the record that if Jefferson County goes broke paying me to represent Mr. Howell, I intend to do it.
MR. SCHNEIDER: The essence, I think, of the inquiry is exactly what Mr. Sheffield said. You know, as far as he's concerned it's fine, but that is not the inquiry that the Court needs to make. And until and unless Mr. Howell expresses on the record an affirmative waiver of any sort of conflict that may be caused by this information, I think that we have a
THE COURT: I am not going to require M. Howell to express anything on the record, affirmatively or negatively, if he chooses not to; but I am giving him an opportunity to be heard in this regard, and if he wants to say anything to me he can say something to me about that. But it appears to me at this point that there does not, there is not a conflict between Mr. Sheffield and Mr. Howell that would interfere with Mr. Sheffield's ability to represent him.
Now, Mr. Howell, if you want to make any comments other than that I will be happy to hear you, but at this point you and Mr. Sheffield appear to be able to communicate. And as Judge Stafford said in the transcript in the federal case, Mr. Sheffield is probably as good as you're going to get around here, and I think it would certainly be to your benefit to have him represent you. But I want to hear from you if you want to say anything.
DEFENDANT PAUL HOWELL: As I said before, the Court can determine it.
THE COURT: Well, if you leave it up to the Court, at this point I see no reason to disqualify Mr. Sheffield from representing Mr. Howell and I will deny the motion.
It is evident that any apprehension that Sheffield had concerning the bomb threat which had allegedly occurred some nine months before had dissipated. When Howell was asked concerning his position on the matter, he deferred to the court's judgment. From this record, we cannot say that the court abused its discretion in not disqualifying Sheffield from representing defendant. The State had made the motion out of an abundance of caution, and at no time during the hearing before Judge Steinmeyer did Howell ask that Sheffield be removed as his attorney.
The next event relevant to this point on appeal occurred approximately nine months later when attorney Sheffield moved to have a second attorney appointed due to the alleged complexity of the case and the extensive preparation involved. After hearing the argument, the court denied the motion, noting that Sheffield had been able to familiarize himself with the charges by virtue of his participating in the federal proceedings. Thereafter, it was brought to the court's attention that Sheffield had obtained the appointment of a mental health expert but that Howell refused to speak with this individual because he did not wish the case to be defended on the grounds of incompetency. While Sheffield maintained that the insanity defense was the "only defense" available, Howell disputed this and the judge observed that this was Howell's choice to make. During the trial, which commenced on October 12, 1994, after a change of venue to Escambia County, Howell also made various complaints concerning Sheffield's representation. However, Howell never requested the opportunity to represent himself. In each instance, *680 the trial court considered Howell's complaints and concluded that Sheffield was providing him with proper representation.
In Hardwick v. State, 521 So.2d 1071 (Fla.1988), this Court adopted the procedure announced in Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973), to be followed when a defendant complains that his appointed counsel is providing him with ineffective representation. When this occurs, the trial judge is required to make a sufficient inquiry of the defendant to determine whether or not appointed counsel is rendering effective assistance to the defendant. However, the trial judge's inquiry can only be as specific as the defendant's complaint. Lowe v. State, 650 So.2d 969 (Fla.1994). Here, the trial court made an adequate inquiry into Howell's complaints of ineffectiveness and properly determined them to be without merit. Because Howell never requested to represent himself, he was not entitled to an inquiry on the subject of self-representation under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Further, we find no abuse of discretion in the trial court's denial of Howell's request for the appointment of another attorney to assist Sheffield in his defense. Armstrong v. State, 642 So.2d 730 (Fla.1994); Reaves v. State, 639 So.2d 1 (Fla. 1994).

PENALTY PHASE
Howell challenges several of the statutory aggravating circumstances which the trial court found applicable to the murder. Howell first asserts that the trial court erred in finding that he had knowingly created a great risk to many persons because Trooper Fulford was alone when the bomb exploded and that the trial court's conjecture and speculation about who might have been killed cannot be used as a basis to support this aggravator. The trial court's sentencing order addressed this aggravator as follows:
The evidence presented compelled the conclusion that the Defendant constructed the bomb, which exploded and killed Florida Highway Patrol Trooper James Fulford, or the specific purpose of killing Tammie Bailey at her home in Marianna, Florida. The Defendant knew that the intended victim had at least one small child who lived with her and that Lester Watson, who he paid to deliver the bomb, would be present when the bomb was delivered. The Defendant also sent Lester Watson to Yolanda McAllister to take him to Tammie Bailey's house and, therefore, could reasonably have expected her to accompany him to the house. In fact, Tammie Bailey lived in a duplex with a mother and two children living in the other side.
The photographs at the scene of the explosion introduced into evidence in the guilt phase of the trial showed the magnitude of the force of the bomb. The testimony indicated that on more than one occasion the Defendant, or friends of his, had exploded other pipe bombs so that the Defendant knew of the force of the intended explosion and the effect it would have on anyone close by as well as the structure in which the explosion would take place. The Defendant concealed the bomb in a microwave oven wrapped as a gift and it, therefore, created a high probability that many persons would be present to open the gift. This aggravating circumstance was proved beyond a reasonable doubt.
This Court has previously held that this aggravator requires the defendant to have knowingly created an immediate and present risk of death to many persons. Williams v. State, 574 So.2d 136, 138 (Fla.1991). We have interpreted the term "many persons" to require that a risk of death be posed to more than three other persons besides the homicide victim. See Fitzpatrick v. State, 437 So.2d 1072 (Fla.1983). The majority of this Court's prior opinions addressing this aggravator have addressed situations where persons present at the scene of the crime were at risk of being injured or killed by gunfire. See, e.g., Johnson v. State, 696 So.2d 326 (Fla.1997) (great risk of death to many people aggravator found where four people other than victim were in laundromat when defendant broke in and began shooting). However, the instant case poses a situation more akin to our decisions addressing the risk of death to many persons caused by arson or poisoning. In Welty v. State, 402 So.2d 1159 (Fla.1981), we found that setting fire to a *681 condominium when six elderly people were asleep in other units created a great risk of death to many persons. In Trepal v. State, 621 So.2d 1361 (Fla.1993), the defendant argued that it was mere speculation that the bottles of cola (laced with lethal doses of thallium, a deadly poison) he placed in the victims' household posed a great risk of harm to many persons because only four persons lived in the house. We rejected this argument and found that the aggravator applied based on the fact that seven persons lived on the victims' property, family members visited regularly, and the defendant knew that many people came and went on the victims' property.
As pointed out by the trial court, if the bomb Howell constructed had reached its intended destination, Tammie Bailey, Bailey's child, Lester Watson, Yolanda McAllister, and the mother and two children residing in the adjoining apartment would have been potentially at risk of death. Furthermore, even though the victim Howell originally targeted was not killed, this case involved a sophisticated and lethal bomb of great magnitude transported on major interstate highways all the way from Fort Lauderdale to Marianna, Florida. That fortuitously only one person was killed does not change the fact that Howell knew that the bomb he constructed and caused to be transported through the length and breadth of Florida had the capacity to kill a "great number of people" as we have previously defined that term. Based on the expert testimony presented regarding the violence of the explosion and the fire that it caused, there was a likelihood or high probability that the occupants of any vehicles driving on I-10 in the near vicinity at the time of the explosion were at risk of death. See Delap v. State, 440 So.2d 1242, 1256 (Fla.1983) ("great risk of death to many persons aggravator" supported by evidence that Delap drove erratically on a highway while struggling with victim, thereby presenting a danger to the lives of motorists on the highway). We therefore reject Howell's challenge to this aggravator and hold that the trial court properly found that this aggravator applied to the murder.
Howell also asserts that the trial court erred in finding that the murder was committed to avoid or prevent arrest. The trial court's sentencing order states:
The evidence in the guilt phase established that the reason for the construction and delivery of the bomb was to eliminate the intended victim as a witness that could link Defendant and his brother to a prior murder. Killing to eliminate a witness to a prior crime is a basis for this factor. Fotopoulos v. State, 608 So.2d 784 (Fla.1992). The killing of an unintended victim is immaterial because the intended act remains the same. Sweet v. State 624 So.2d 1138 (Fla.1993). The evidence is clear that this aggravating circumstance was applicable, the jury was instructed with regard to it and the Court finds that it was proved beyond a reasonable doubt.
Howell argues that in order for this aggravator to apply to the intended murder of a layperson, as opposed to the murder of a law enforcement officer, witness elimination must be the defendant's dominant motive, and that in this case, there was evidence presented that Howell wanted to murder Bailey for financial reasons. Howell asserts that he was angry at Bailey because he had sent money to her to travel down to Fort Lauderdale but she had never made the trip. Howell further asserts that the concept of "transferred intent" set forth in Sweet v. State, 624 So.2d 1138 (Fla.1993), only applies where witness elimination is the dominant motive for the crime.
Evidence was presented at trial establishing that Bailey was involved in the cover-up following the murder of Alphonso Tillman by Patrick Howell and that she had personal knowledge of Howell's attempts to dispose of the vehicle in which Tillman was murdered. Trevor Sealey testified that Howell asked him to transport a package to "some girls" who had "snitched" on his brother. Sealey also said that he understood from the context of the conversation and from Howell's gestures that the package would contain a bomb. While it may have been true that Howell was also upset with Bailey because of the money he had sent her, we find that ample evidence was presented in *682 support of the conclusion that witness elimination was Howell's dominant motive for the murder of Bailey. The fact that Howell may have had other motives for murdering Bailey does not preclude the application of this aggravator. See Fotopoulos v. State 608 So.2d 784, 792 (Fla.1992). Pursuant to our decision in Sweet that the concept of "transferred intent" may be used when applying the avoid arrest aggravator, we find that even though Trooper Fulford, rather than the intended victim, was killed by the bomb, the avoid arrest aggravator is applicable to the murder.
We also reject Howell's challenge to the CCP aggravator. Howell does not attack the evidence presented at trial to establish that the murder was committed in a cold, calculated, and premeditated manner without pretense of moral justification. Howell instead asserts that he had no intent to kill Trooper Fulford and that the CCP aggravator should not apply in cases where the only premeditation arises solely from transferred intent. We disagree. We have held that the heightened premeditation necessary for the aggravating circumstance does not have to be directed toward the specific victim. Provenzano v. State, 497 So.2d 1177 (Fla.1986). The key to this factor is the level of planning rather than the success or failure of the plan. Sweet. In addition, at the time Howell was informed that law enforcement officers had the rental car containing the bomb in their custody, and chose not to inform them of the presence of the bomb, he had sufficient opportunity to formulate the intent that law enforcement personnel would be the bomb's intended victim.
Howell also challenges the finding that the victim, Trooper Fulford, was a law enforcement officer engaged in the performance of his official duties. Howell asserts that this aggravator should not have been applied to the murder because the evidence did not establish that he knowingly killed a law enforcement officer. However, he had knowledge that Lester Watson had been arrested and that law enforcement officers had custody of the car. At the time the dispatcher called Howell to ask whether the rental car had been stolen, Howell chose not to warn the officers of the lethal bomb in the trunk. Based on this knowledge, Howell knew or could have reasonably foreseen that law enforcement personnel would search the vehicle and its contents and thereby detonate the bomb. We find that this aggravator was properly found by the trial court.
Howell's final claim[1] asserts that his death sentence is disproportionate. His primary argument is predicated on the fact that the other two named codefendants, Lester Watson and Patrick Howell, did not receive death sentences. Addressing this issue, the trial court's sentencing order states:
Defendant's brother, Patrick Howell, received a sentence of life imprisonment without eligibility of parole for twenty five years. According to statements made by the prosecutor at the time the Court agreed to accept the plea of the brother, the State only had one uncorroborated witness as to the brother's involvement which was to direct the Defendant to commit the crime. The other defendant, Lester Watson, pled to Second Degree Murder and was sentenced to forty years in prison. His involvement was to drive the car with the giftwrapped bomb in the trunk and deliver the bomb to the intended victim. There was some question as to whether he knew that the bomb was in the car, he indicated that he thought the package contained drugs for sale. In any event as soon as he learned of the Trooper's death he cooperated completely with law enforcement officers which resulted in a compelling case against the Defendant.
There is no question but that this Defendant is by far the most culpable of those involved and, therefore, that there is no problem of proportionality with a sentence of death for this Defendant.
Disparate treatment of defendants is not impermissible in situations where a particular *683 defendant is more culpable. See Larzelere v. State, 676 So.2d 394 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996); Cardona v. State 641 So.2d 361 (Fla.1994); Hoffman v. State, 474 So.2d 1178 (Fla.1985) (it is permissible to impose different sentences on capital defendants whose various degrees of participation and culpability are different from one another). Based on the evidence presented regarding Howell's greater culpability in the murder as compared to his codefendants, we find that his death sentence is proportional. The evidence fully supports the trial court's conclusion that the evidence in mitigation pales "into insignificance when considering the enormity of the proved aggravating factors weighed against the want of mitigating circumstances and compels the sentence in accordance with the recommendation of the jury."

CONCLUSION
We affirm Howell's conviction of first-degree murder and sentence of death. We also affirm his convictions for making, possessing, placing, or discharging a destructive device or bomb.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING and WELLS, JJ., and GRIMES, Senior Justice, concur.
ANSTEAD, J., concurs in result only as to conviction and concurs as to sentence.
NOTES
[1] We reject without discussion Howell's remaining penalty-phase claims, to wit: (1) failure to give special requested penalty-phase instructions was error; (2) felony-murder aggravating circumstance is unconstitutional; and (3) sentencing order failed to properly evaluate mitigating circumstances and to properly weigh aggravating circumstances against mitigating circumstances.