970 So.2d 848 (2007)
STATE of Florida, Appellant,
v.
Betty Jean WALTER, Appellee.
No. 2D06-2832.
District Court of Appeal of Florida, Second District.
October 31, 2007.
Rehearing Denied January 3, 2008.
*849 Bill McCollum, Attorney General, Tallahassee, and Helene S. Parnes, Assistant Attorney General, Tampa, for Appellant.
A.R. Mander, III, of Greenfelder, Mander, Murphy, Dwyer & Morris, Dade City, for Appellee.
ALTENBERND, Judge.
The State appeals the trial court's order granting Betty Jean Walter's motion to suppress evidence in its case against her for fraudulent use of personal identification[1]; forgery of bank bills, checks, drafts or promissory notes[2]; and grand theft.[3] We reverse because the trial court erred in finding that Ms. Walter's statements were rendered involuntary by a detective's statements during an initial interview.
Beginning in the summer of 2002, Ms. Walter was employed by a wireless telephone company as a salesperson in a retail store. When a customer purchased wireless service, Ms. Walter would give the customer a form on which the customer would provide personal information. Ms. Walter would verify the customer's information, provide them with a cellular phone, and activate their service. The store manager, the employee, and the customer would each keep a copy of the customer's personal information. Ms. Walter received a $10 commission for each contract.
When Ms. Walter was unavailable to cover her shift, she arranged for other people who were not employed by the company to cover for her. Ms. Walter would write and sign the contract for the applications, and the nonemployees would use those contracts and her employee identification number to activate the service.
In 2004, a detective contacted Ms. Walter several times over the telephone during an investigation of identity theft. Apparently, personal information from customer forms used to establish wireless service had been misappropriated to establish false accounts, all of which used Ms. Walter's street address as the customer's street address. On April 7, 2004, the detective conducted a noncustodial interview with Ms. Walter in her home. The detective wore plain clothes. A friend of Ms. Walter also participated in the interview. Although the interview was recorded, the tape was stopped and restarted with no explanation.
During this interview, the detective told Ms. Walter that he was there to investigate her as a possible suspect in the fraudulent use of personal identification on cellular *850 phone applications. He showed her an investigation packet assembled by her employer that documented the identity theft. He assured her that she would not be arrested that day and that she was free to terminate the interview at any point. The detective informed Ms. Walter, however, that any information she gave him would be turned over to the State Attorney. Showing her the stack of paper evidence, the detective stated:
I've got to be honest with you. I've got to be honest with you both. My job is to gather information. My job is to present what information I gather to the State Attorneys for prosecution. I've got to be honest with you, based on the evidence I have right now, I have enough to make the arrest.
I'll be honest with you. I can tell you that. I told you that. If it comes down to it and you're working with me, I told you I'll work with you, but that's why I want an interview first to get to the bottom of this.
. . . .
My jobmy job is to clear this case and, if there's enough evidence for prosecution, then that's what I have to do and that's just business. I mean, there's no hard feelings. That's just my job. That's what I get paid to do.
Ms. Walter's friend told the detective that Ms. Walter was nervous because she thought she was being placed under arrest. The detective responded, "I told her I wasn't going to arrest her. I have no reason to lie to you, Ms. Walter. I told you that on the phone." The friend proceeded to explain more details about the cell phone operation and the people involved. When Ms. Walter admitted that she knew about the scam but did not know how it was set up, the detective again showed her the forty pages of forged contracts that used her address. The friend asked if that was all of the detective's evidence. He replied:
I have enough right here. That's what we call probable cause. I need probable cause to make an arrest. Based on this packet alone, I have probable cause to make an arrest, but, once again, you've cooperated with me, Ms. Walter, I'm not going to do that.
I want to talk to you. I'm trying to give you the benefit of the doubt. I'm not accusing anybody of anything. That's why I'm trying to get to the bottom of it. Like I said, my job is to gather information and forward it to the State Attorneys for prosecution and, if an arrest is necessary, that's what I have to do.
At this point in time, it's only an investigation. That's why I'm out here talking to you. Once again, having cooperated, you're not under arrest. You're giving this interview of your own free will and you're free to terminate at any time. You understand that; correct? Yes, no, maybe?
The interview continued with Ms. Walter explaining more about how the fraudulent wireless service scheme worked and implicating several other people as the primary participants. True to his statements, at the conclusion of the interview the detective did not arrest Ms. Walter.
Ms. Walter's next reported contact on the case occurred almost a year later. On March 25, 2005, after reviewing the information and tapes from the previous investigation, a different detective conducted a follow-up interview of Ms. Walter in her home. The same friend that participated in the previous interview was again present. The detective wore plain clothes. The interview was taped. At the conclusion of this interview, the detective arrested her.
*851 Ms. Walter filed a motion to suppress. The tape of the first interview was played during the suppression hearing. Without listening to the tape of the second interview, the trial court granted the motion to suppress the statements made at both interviews because it concluded the first detective had made coercive promises to Ms. Walter that the second detective did not withdraw. In concluding that the statements were involuntary, the trial court relied on Grasle v. State, 779 So.2d 334 (Fla. 2d DCA 2000), in which the officer, under the auspices of friendship, promised to protect the defendant from certain charges.
On a motion to suppress, a trial court's ruling is a mixed question of law and fact. Seibert v. State, 923 So.2d 460, 468 (Fla.2006). The determination of what statements were made is a matter of historical fact subject to a presumption of correctness. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Whether the statements constitute coercion, however, is a matter of law reviewed de novo. See Connor v. State, 803 So.2d 598, 608 (Fla.2001).
When a defendant challenges the voluntariness of his or her confession, the State has the burden to establish by a preponderance of the evidence that the confession was freely and voluntarily given. See DeConingh v. State, 433 So.2d 501, 503 (Fla.1983). Generally, a confession is not regarded as freely and voluntarily given if it has been elicited by a direct or implied promise of leniency. See Johnson v. State, 696 So.2d 326, 329 (Fla.1997). Where there is an express quid pro quo, such as a promise of protection from prosecution for cooperation, the promise of leniency may render a confession or inculpatory statement involuntary. See Walker v. State, 771 So.2d 573, 575 (Fla. 1st DCA 2000). In Brewer v. State, 386 So.2d 232 (Fla.1980), the court concluded that the two officers' actions were coercive because they "raised the spectre of the electric chair" and suggested the officers had the power to see that the defendant received leniency. Id. at 235.
A distinction exists, however, between improper police techniques that are "calculated to exert improper influence, to trick, or to delude the suspect as to his true position" and proper police statements of relevant facts. Thomas v. State, 456 So.2d 454, 458 (Fla.1984). A police officer can initially approach a suspect under the pretense of collecting information without that pretense rendering any admissions involuntary. See Lukehart v. State, 776 So.2d 906, 917-20 (Fla.2000). Voluntary statements that support an arrest do not "warrant a presumption of compulsion." Brown v. State, 565 So.2d 304, 306 (Fla.1990), abrogated on other grounds by Jackson v. State, 648 So.2d 85, 88 (Fla.1994). Moreover, a statement is not rendered involuntary if the officers inform a suspect of realistic penalties, encourage the suspect to tell the truth, or tell the suspect that things would be easier if the suspect told the truth. Frazier v. State, 107 So.2d 16, 22 (Fla.1958); Nelson v. State, 688 So.2d 971, 974 (Fla. 4th DCA 1997).
To render a statement inadmissible, the threat or promise must constitute "outrageous behavior" that induces the confession and must also have a "causal nexus between the improper police conduct and the confession." Nelson, 688 So.2d at 974; see also Fare v. Michael C., 442 U.S. 707, 727-28, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (stating that a mere indication by police that "a cooperative attitude would be to respondent's benefit" was not sufficient to find the police coerced *852 a waiver of Miranda[4] rights). An officer agreeing to "make one's cooperation known to prosecuting authorities and to the court does not render a confession involuntary." Maqueira v. State, 588 So.2d 221, 223 (Fla.1991).
Here, the first detective's statements did not establish an express quid pro quo promise that Ms. Walter would be protected from prosecution if she cooperated. The first detective did not threaten harsher punishment if Ms. Walter did not cooperate. Taken in isolation, the statement "having cooperated, you're not under arrest" might arguably appear to be a promise of leniency as to an initial arrest. See Johnson, 696 So.2d at 330. In context, however, the statements do not misstate the importance of Ms. Walter's confession or constitute "outrageous behavior" inducing her cooperation. Rather, the detective clearly informed Ms. Walter that he was conducting an investigation and that he must forward all information to the State Attorney. He twice stated that he had enough evidence to make an arrest and that if there was enough evidence for prosecution, an arrest might be necessary. Unlike the cases where the police made misleading promises of protection from prosecution, in this situation the detective informed Ms. Walter that she was a suspect in an investigation and that he would turn over any evidence he gathered. Finally, it should not be overlooked that the promise the initial detective made that he was just gathering information and was not there to arrest Ms. Walter was true. He did not arrest her. She was not arrested until almost a year later by another detective at a time when law enforcement decided that the case should be prosecuted. The detective did not use pressure, threats, or promises to coerce Ms. Walter's statements. Therefore, she made voluntary admissions during a noncustodial interview that should not have been suppressed.
The order of suppression is reversed and the case is remanded for further proceedings. This opinion does not preclude Ms. Walter from challenging the circumstances of the second interview, which were not fully developed during the suppression hearing.
Reversed and remanded.
WALLACE and LaROSE, JJ., concur.
NOTES
[1] See § 817.568(2)(a), Fla. Stat. (2002).
[2] See § 831.07, Fla. Stat. (2002).
[3] See § 812.014(2)(c), Fla. Stat. (2002).
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).