382 So.2d 1205 (1980)
Anthony ANTONE, Appellant,
v.
STATE of Florida, Appellee.
No. 50240.
Supreme Court of Florida.
March 27, 1980.
Rehearing Denied May 21, 1980.
*1208 Angelo M. Ferlita of Diecidue, Ferlita & Prieto, Tampa, for appellant.
Jim Smith, Atty. Gen., Charles Corces, Jr., Asst. Atty. Gen., Tampa and T. Edward Austin, State's Atty., Jacksonville, for appellee.
PER CURIAM.
The appellant Anthony Antone was convicted of murder in the first degree. The trial judge imposed the death sentence in accordance with the jury's advisory sentence recommendation. We have jurisdiction.[1]
For the reasons expressed, we affirm this contract murder conviction and the imposition of the death sentence.
Our consideration of this cause was delayed by the remand for testimony on an application for new trial relative to an agreement made by the Florida Department of Criminal Law Enforcement (FDCLE) for attorney representation of the principal witness, Haskew, and the payment of $11,500 fee for attorney services. This agreement was unknown to either the prosecutor or defense counsel until this cause was on appeal to this Court. We find the conduct of the FDCLE improper but conclude there was no prejudicial error when we consider the totality of the record.
This murder was committed on the morning of October 23, 1975, when Detective Richard Cloud, a suspended Tampa police officer, was killed at the front door of his home. Antone's conviction was based on the fact that he was the mastermind of this execution slaying, and he directly hired the two men who carried out this contract murder. One of the men Antone hired, Ellis Marlow Haskew, was the primary witness for the state.
*1209 Haskew's trial testimony revealed the following material facts of this murder. Upon discharge from Florida State Prison in May, 1975, Haskew returned to Tampa to live and to establish contact with Antone. In September, 1975, Haskew helped Benjamin Gilford to escape from prison, after which he and Gilford went to the Bradenton area to live. Immediately after this escape, Antone advised Haskew by telephone that he was looking for someone to perform five "installations," which Haskew defined as murders. Haskew and Gilford then traveled to Tampa where Antone personally informed Haskew that another man wanted five people killed, including Richard Cloud. Haskew accepted $1,750 in "front money" which was used in part to purchase a used Oldsmobile. In late September, 1975, he went to Antone's house and was given a .32 caliber automatic with an attached silencer to test. Although Antone previously had tested the gun himself, he wanted Haskew to check the effectiveness of the silencer. Haskew fired the gun twice into a rattan couch in Antone's home. After the testing, Antone repacked the silencer with fiber used in air conditioning filters which he stored in a shed behind his house.
In addition to supplying Haskew with the gun, Antone gave him a picture of Cloud and drove Haskew by Cloud's home. Approximately ten days before Cloud's death, Antone asked Haskew to complete his assignment because Cloud was due to testify before a grand jury about matters concerning Antone's friends. Haskew made final preparations for this murder by constructing a cardboard box to conceal the weapon, retesting the gun, which required more packing fiber from Antone, and obtaining ammunition from an outside party. On October 23, 1975, he and Gilford drove past Cloud's home and noticed that only Cloud's car was there. They circled the house, and Gilford left the vehicle. While Gilford entered the house, Haskew drove around the block. When he returned to pick Gilford up, he saw an ashtray fly out of the front door after Gilford. Haskew recalled that Gilford later explained that Cloud had thrown an ashtray or a plant at him as he fired at Cloud. Antone visited Haskew at his apartment later that day, gave him $200 to get Gilford out of town, and drove with Haskew to Gandy Bridge to dispose of the murder weapon in Tampa Bay. Haskew made several trips between Tampa and Miami in the ensuing days and received about $9,000 from Antone in several installments. It was also established that Antone personally received at least $750 for this contract murder.
On February 25, 1976, at approximately 8:30 a.m., Haskew was arrested in Miami. Although he initially denied involvement with the Cloud murder, later that day he admitted his participation and agreed to cooperate with law enforcement authorities. Haskew fully implicated Antone as the person who hired him and Gilford to murder Cloud. He also explained the telephone code arrangement which enabled Antone to determine the number from which Haskew was calling. Upon receiving the code, Antone would return the call to that number from a telephone booth. In cooperation with the FDCLE, Haskew called the appellant at approximately 8:30 p.m. that same day and used the code to have Antone return the call at a pay phone in the FDCLE building in Miami. The appellant Antone had been placed under surveillance at the time and was observed leaving his house and going to a pay phone booth around the corner. A recording made of the return call from Antone was later introduced into evidence.
Approximately an hour and a half later, at 10 p.m. on February 25, 1976, Antone was arrested at his home and taken to the office of the Federal Bureau of Investigation. While at that office, Antone complained of chest pains and discomfort. Antone was taken to the hospital where he was subsequently placed in the coronary care unit. At approximately 1:10 a.m. the following morning, with the approval of the attending physician, FBI agent Arwine entered Antone's hospital room. Arwine testified that "Mr. Antone told me that he was a hundred percent Sicilian and Sicilians do not fink."
*1210 In the afternoon of February 26, 1976, a search warrant was issued to search Antone's residence, including any vehicles, curtilages and appurtenances. The warrant sought from the premises "certain evidence, to wit: .32 caliber projectiles, couch, cushions, couch stuffing, and counterfeit currency." The affidavit in support of the warrant stated: (1) Richard Cloud was shot and killed on October 23, 1975, and evidence from the crime scene indicated that the shots fired were from a .32 caliber automatic pistol; (2) Ellis Marlow Haskew had been arrested and had admitted being present at the murder of Cloud by Benjamin Gilford, and that Gilford used a .32 automatic pistol given to Haskew by Antone; (3) prior to giving the pistol to Haskew, Antone tested the weapon by firing it into a couch in the den of his residence, and the fired projectiles were still in the couch, floor, or surrounding walls; (4) at the time of Antone's arrest, the arresting officer had seen a couch in those premises; and (5) Haskew had informed the affiant that Antone kept counterfeit money in the premises, and this appeared to be confirmed in a recorded conversation between Haskew and Antone which was overheard by the affiant.
On February 26, 1976, a search of Antone's premises was conducted in accordance with the warrant at approximately 6:30 p.m. A bullet was recovered from a rattan couch which, when compared with the bullet removed from the left leg of Cloud, was found to have been fired from the same weapon. Identical comparisons were also made with other bullets found at Cloud's home, including spent bullets found on the carpet under the dining room table, beneath the couch, and under the house in a joist. In addition, the search produced blue air conditioning fibers which were seized from a work shed in the rear of Antone's house. Haskew had stated that these fibers were used to pack the silencer. Expert testimony indicated that these seized fibers compared favorably with fibers taken from the screen door at Cloud's house immediately following the murder.
In support of Haskew's testimony, a neighbor testified that he was standing in his carport and heard shots from the direction of Cloud's house. He looked up and saw a car with a driver in it. The engine was running and the passenger door was wide open. A few seconds later a man ran from Cloud's house with a brown cardboard box in his hand, jumped in the car, and sped off. The record further reflects that cardboard fragments were found near the screen door of Cloud's house, and four bullet holes were in the door. Cloud's mother testified that a week prior to her son's death a man whom she identified as the appellant Antone came to Cloud's home asking for him.
Antone testified in his own behalf and denied participation in this murder-for-hire scheme. Counsel for the appellant also presented testimony impeaching Haskew's reputation for truth and veracity. Haskew acknowledged during cross-examination that, with the advice of counsel, he had entered into a plea agreement with the state. Under the agreement Haskew would receive a thirty-five year sentence, and he expected to be eligible for parole in seven to eight years.
The jury returned a verdict of guilty and recommended the imposition of the death penalty. The trial judge imposed the death sentence, finding as aggravating circumstances: (1) Antone had been convicted of two armed robberies which were felonies involving the use of threat of violence to another person; (2) this was a contract murder and therefore committed for pecuniary gain; (3) Antone ordered the execution of Cloud to disrupt and hinder the enforcement of laws; and (4) the murder was particularly heinous, cruel, and vicious. The trial judge found no mitigating circumstances.
While this cause was on appeal, the prosecuting attorney filed a motion to supplement the record which advised this Court that the FDCLE had paid substantial fees to attorneys for Ellis Marlow Haskew and that such information had not been previously known to the prosecuting attorney. In Antone v. State, 355 So.2d 777 (Fla. 1978), *1211 we remanded this cause to the trial court for a determination of whether a violation prohibited by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), had occurred and whether a new trial should be granted. We advised the trial court that it should be guided by the materiality standards defined by the United States Supreme Court in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
In a detailed order, the trial court denied a new trial. It found that the FDCLE had paid the sum of $11,500 for an attorney to represent Haskew, and that Haskew was aware of this fact. The trial court further found that the questions asked of Haskew, both in deposition and at trial, were directed solely to the plea bargain and were answered truthfully. The trial court concluded that there was no violation of the standards established by the United States Supreme Court in Brady v. Maryland and United States v. Agurs.
We will consider the issues raised in this appeal in three parts: (a) the trial phase, (b) the request for new trial on the grounds of newly discovered evidence, and (c) the appropriateness of the sentence.

A. Trial Phase

Antone contends his conviction should be set aside because: (1) the search of his house was improper; (2) his statements were inadmissible; (3) testimony relating to his silence was improperly admitted in evidence; (4) testimony implicating him in other crimes was improperly allowed; (5) inquiry concerning Haskew's character was improperly limited; (6) the trial court improperly denied his motion to compel disclosure of a confidential informant; (7) his motion to dismiss the indictment was improperly denied; and (8) Florida's death penalty statute is unconstitutional. For the reasons expressed, we reject each contention.

Validity of Search Warrant
In challenging the validity of the search warrant, Antone asserts that the supporting affidavit contained material misrepresentations, contained an insufficient statement of underlying facts, and lacked the requisite specificity in describing the scope of the search. The asserted misrepresentation is based on the statement that "Anthony Antone keeps counterfeit currency within the northeast bedroom door frame." Because no counterfeit money was found, Antone contends this statement was false and, therefore, the evidence obtained under the authority of the warrant must be suppressed. Although the state disputes the falsity of the allegations, we need not decide the issue of its truth or falsity. The issue is controlled by Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which held that where a defendant makes a preliminary showing that a false statement made knowingly and intentionally or with reckless disregard for the truth was included by the affiant in the search warrant affidavit and the false statement was necessary to the finding of probable cause, and evidentiary hearing must be held. If during an evidentiary hearing the alleged perjury is established by preponderance of the evidence, the court must then excise the falsity from the affidavit and review the remainder of the affidavit to determine whether there remains sufficient grounds to establish probable cause. There was an evidentiary hearing in the instant case. There was no showing that the statement was intentionally and falsely made. In fact, during the suppression hearing counsel stated: "We don't suggest that the misrepresentation was intentional." Further, and most important, we find that even if the challenged statements were excised, the remainder of the affidavit is sufficient to establish probable cause.
The appellant also attacks the search warrant on the basis that there are insufficient underlying facts to meet the tests set forth in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The Aguilar-Spinelli test requires that a warrant which is based on an informant's tip must: (1) establish that the information provided by the informant, if true, is sufficient to support a finding of probable cause, *1212 and (2) the affidavit must establish that the informant is credible or his information is reliable. The allegations in the affidavit that projectiles fired from the murder weapon would be found in a couch or in a wall in Antone's home and that counterfeit money was kept by Antone in his home clearly establishes probable cause. Secondly, the credibility of Haskew's confession, that he was present when Richard Cloud was murdered with a .32 automatic pistol, was established when tests revealed that a bullet recovered from Cloud's body had in fact been fired from a .32 caliber pistol. Further, the affidavit's detailed description of Antone's home was in part corroborated by a police officer who recently had been at the home and had seen a couch located in precisely the place where Haskew described. The affidavit reveals both the source of Haskew's information and the corroborating evidence found by independent investigations. In our view, this affidavit meets both federal and state requirements and is legally sufficient.[2]
The appellant next contends that the admission into evidence of the blue fiber was improper because it was seized from the shed or workshop behind Antone's house and the description of the fiber was not included in the warrant. We disagree. The description of the place to be searched expressly included the term "curtilage." That term encompasses a workshed used in connection with a dwelling for the purposes of a search pursuant to a properly issued warrant. See Joyner v. State, 303 So.2d 60 (Fla. 1st DCA 1974); Phillips v. State, 177 So.2d 243 (Fla. 1st DCA 1965). We find that the shed was a proper subject of the search warrant, and, under the circumstances of this case, the seizure of the fiber was proper and reasonable.

Admissibility of Appellant's Statements
Antone contends that several brief statements which he made following his arrest should have been suppressed because they were obtained in violation of his fifth amendment privilege against self-incrimination. On the night of his arrest, Antone suffered a mild heart attack which he claims prevented his appreciation of the Miranda warnings, created a coercive atmosphere, and precluded his statements from being genuinely voluntary. We reject these contentions and find that Antone's actions reflect a complete understanding of his situation. Immediately following the administration of the warnings and prior to his mild heart attack, he agreed to be interviewed and further agreed to speak with Haskew over the phone, at which time he continually repeated "Marlow, why did you do this to me?" Antone began to complain of discomfort only after the telephone conversation and an admission that he knew Haskew and two other men were the subject of an investigation.
Antone also challenges the admissibility of his statement made at the hospital, "Sicilians do not fink." This statement, however, appears from the record to be clearly voluntary and was made after a doctor advised officers it would be all right to speak with Antone. Voluntary statements are simply not barred from admissibility by the fifth amendment.
Antone next asserts that the trial judge's naked denial of the motion to suppress these statements mandates a reversal pursuant to McDole v. State, 283 So.2d 553 (Fla. 1973). This Court, however, has modified the strict requirement that an express finding must appear in the record. See Wilson v. State, 304 So.2d 119 (Fla. 1974); Henry v. State, 328 So.2d 430, 431 n. 1, (Fla.), cert. denied, 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319 (1976).[3] Ideally, *1213 the trial judge should specify his conclusions concerning the voluntariness of a disputed confession or inculpatory statement. However, due process is not offended when the issue of voluntariness is specifically before the judge and he determines that the statements are admissible without using the magic word "voluntary." The record reflects that the only issue before the court was the voluntariness of Antone's statements. The evidence clearly supports the finding that these statements were free from coercion. The resulting denial of the motion to suppress was thus not in error.

Comment on Silence
Antone contends that the following testimony of Agent Arwine constitutes impermissible comment on Antone's decision to remain silent:
I thereafter went into the room and was, during this period, from 1:10 until 1:20, the time I left the room, there was a nurse in and out of the room and Mr. Antone did not volunteer any information except he made one statement. Mr. Antone told me that he was a hundred percent Sicilian and Sicilians do not fink.
We find this testimony permissible as it recounted Antone's affirmative statement. In fact, Antone did not stand mute; Arwine's testimony comments not on Antone's silence but on what he said. Further, defense counsel interposed no objection at trial and, therefore, there is no fundamental constitutional error. Clark v. State, 363 So.2d 331 (Fla. 1978).

Evidence of Unrelated Criminal Activity
Antone maintains that we must reverse because the trial court failed to grant a mistrial following Haskew's testimony implicating Antone in other criminal activity. Haskew's testimony related that Antone wanted him to kill five men, three named and two unnamed. Our view of the record establishes that the challenged testimony relating to other criminal activity occurred as part of the primary arrangements for this contract murder and was therefore relevant to show the existence of this conspiracy. See Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).

Improper Limitation in Presenting Impeachment Testimony
Antone asserts that the trial court erroneously limited the direct examination by defense counsel of a character witness whose testimony impeached Haskew's reputation for truth and veracity. Mr. Tommy Walker, former mayor of the City of Bartow, testified:
Q Mr. Walker, do you know the general reputation of Ellis Marlow Haskew for truth and veracity in the community of Bartow?
A I would think I do, yes.
Q Have you ever discussed his reputation with others in the community?
MR. BOWDEN: Your Honor, I object to the form of the question.
THE COURT: You may rephrase that.
Q (By Mr. Ferlita) Have you ever heard his reputation discussed by other people?
A Yes, sir, often.
Q What is that reputation of Ellis Marlow Haskew for truth and veracity within the community of Bartow?
MR. BOWDEN: Objection to the form of the question, Your Honor.
THE COURT: Overruled.
THE WITNESS: Answer?
THE COURT: Yes, you may answer.
THE WITNESS: I would say it's not good.
Q (By Mr. Ferlita) Based on the general reputation of Marlow Haskew for truth and veracity, would you believe him under oath?
MR. BOWDEN: Objection, Your Honor. That is an improper question of the witness.
THE COURT: Sustained.
This record clearly reflects that the witness was properly allowed to tell the jury that Haskew's reputation for truth and veracity *1214 in the community was not good. A further question objected to by the prosecution and sustained by the trial court sought to elicit the individual and personal view of the witness. We agree with the trial court. The clear weight of authority allows only the general reputation of the witness in the community to be admissible.[4]See generally C. McCormick, Evidence § 44 (2d ed. 1972).
Antone cites two early cases which in dicta suggest that the excluded question would be permissible. Nelson v. State, 32 Fla. 244, 13 So. 61 (1893); Robinson v. State, 16 Fla. 835 (1878). To the extent that these cases allow this type of opinion evidence to impeach a witness, we overrule them. We also find Antone was not prejudiced by the exclusion of the disputed question. Haskew's reputation was properly placed before the jury by the previous question and answer.

Failure to Disclose Confidential Informant
Antone asserts that we must reverse because the trial court denied his motion to compel disclosure of a confidential informant. The case relied on by Antone, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), does not mandate disclosure of every confidential informant. Rather, a careful balancing of interests is necessary. The record reflects that this confidential informant was not present at any material point in this incident and did not testify. We find Antone has not sustained his burden of showing prejudice by this nondisclosure. See Hawkins v. State, 312 So.2d 229 (Fla. 1st DCA 1975).

Failure to Dismiss Indictment and Constitutionality of the Death Penalty Statute

Antone contends that the grand jury which indicted him was improperly selected. More than mere conclusory statements, however, are necessary to sustain such a challenge. See §§ 905.02-.06, Fla. Stat. (1977). He also contends that the right to confront his accusers, the right to counsel, and other constitutional rights were violated by the instant grand jury proceedings. The protections afforded by the Bill of Rights, however, do not attach in full to grant jury proceedings which are inquisitorial rather than adversary in nature. See, e.g., United States v. Mandujano, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); United States v. Mara, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); In re Groban, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957).
Antone finally urges, without elaboration, that the first-degree murder statute and the death penalty statute are unconstitutional. These issues have been previously rejected, and the law is now settled. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, Hunter v. Florida, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).

B. New Trial Upon Newly Discovered Evidence

Antone contends that he is entitled to a new trial because of the discovery subsequent to trial that the FDCLE had paid an attorney $11,500 to represent Haskew. Antone argues that the failure to disclose this information prior to trial violates both Florida Rule of Criminal Procedure 3.220 and the dictates of Brady v. Maryland and United States v. Agurs. We remanded this cause to the trial court, Antone v. State, 355 So.2d 777 (Fla. 1978), for an evidentiary hearing to determine if a new trial should be granted. The trial court denied a new trial, and we agree.
The resolution of this issue is controlled by the guidelines established in *1215 Agurs. There the majority opinion outlined three situations in which a Brady violation might occur. The first situation occurs when undisclosed evidence demonstrates that the prosecution's case included perjured testimony. If the prosecution knew or should have known of the perjury and there is a reasonable likelihood that the false testimony could have altered the jury's judgment, then fundamental fairness mandates that a new trial be granted. Antone contends that Haskew's testimony concerning the plea bargain arrangement was false, that the prosecution should have known it was false, and that it could have affected the judgment of the jury. We cannot agree. As the trial court reasoned in its detailed order, questions asked of Haskew both in deposition and at trial were directed solely to the plea bargain agreement. Taken in context, Haskew's answers can fairly be characterized as truthful.
The second situation occurs when a pretrial request for specific evidence is made. If the requested evidence is withheld by the prosecution following a specific request and the evidence is material  meaning that it might have affected the outcome of the trial  then a new trial must be ordered. The Agurs court succinctly stated: "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." 427 U.S. at 106, 96 S.Ct. at 2398. In the instant case defense counsel made only general demands for "material or information within the State's possession or control which tends to negate the guilt of the Defendant... ." Antone's attorneys also filed a motion seeking disclosure of all evidence favorable to the defendant. We therefore find this second situation not applicable because no specific request was ever made.
The third situation occurs when a general request for Brady information has been made and a failure to disclose has followed. In this situation, the standard of "materiality" which Agurs states must be applied is as follows:
The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
427 U.S. at 112-13, 96 S.Ct. at 2402 [footnotes omitted]. Applying this test to the undisclosed evidence of FDCLE's payment of Haskew's attorney's fees, we find that Antone's conviction must stand. The evidence in no way detracts from the testimony presented by the state which established Antone's guilt beyond and to the exclusion of every reasonable doubt. At best, the evidence was useful for impeachment of Haskew, but it is not germane to Antone's guilt or innocence. Further, and even more significant, evidence tending to impeach Haskew was already before the jury, and this evidence would have added little to defense efforts to show Haskew as a witness unworthy of the jury's belief. In addition, Haskew would have been entitled to counsel in any event, and there is no showing of any conspiracy between his counsel and the state. Upon our remand, the trial court found no evidence of deliberate prosecutorial misconduct. We agree. We find the undisclosed evidence clearly fails to meet the Agurs test of materiality, and a new trial is therefore not required.[5]

*1216 C. The Sentencing Phase

It is our duty to examine the record in this cause and determine whether there are clear and convincing facts which warrant the imposition of the death penalty. In accepting the jury recommendation and imposing the death penalty, the trial judge found four statutory aggravating factors: (1) Antone had been convicted of two felonies involving the threat of violence to a person, specifically two armed robberies, which we find is appropriately an aggravating circumstance under section 921.141(5)(b); (2) the murder had been committed for pecuniary gain in that Antone received at least $750 for his share of this contract killing, and we find this is an appropriate aggravating circumstance under section 921.141(5)(f); (3) the murder was committed to disrupt and hinder the enforcement of laws in that it prevented the victim from testifying before a grand jury, and we find this is an appropriate aggravating circumstance under section 921.141(5)(g); and (4) this murder was especially heinous, atrocious, and cruel in the manner in which it was carried out. Because of our recent decisions, there may be a question whether this is an appropriate aggravating circumstance. See, e.g., Cooper v. State, 336 So.2d 1133 (Fla. 1976).
The trial court found no mitigating circumstances, and we agree that the record supports this finding. The appellant asserts that he was only an accomplice in a capital felony committed by another person and that his participation was relatively minor. This contention is without merit. The facts in this case are clearly distinguishable from the facts and circumstances in Slater v. State, 316 So.2d 539 (Fla. 1975). Antone was the mastermind of this operation. He supplied the gun, paid the money from his pocket, and pressured Haskew to complete the task. His participation cannot under any view of this record, be termed minor. Without Antone's participation, the murder would not have come to fruition.
Because we fully approve the first three aggravating circumstances and find no mitigating circumstances, it is not necessary to consider the appropriateness of the trial court's finding that the murder was heinous, atrocious, or cruel. An error in finding this aggravating circumstance does not invalidate the imposition of the death sentence. Elledge v. State, 346 So.2d 998 (Fla. 1977); Alford v. State, 307 So.2d 433 (Fla. 1975). The three approved aggravating circumstances are clearly sustained by the record in this case, and there are no appropriate mitigating factors that should be taken into consideration.
For the reasons expressed, we affirm the conviction of Anthony Antone for the murder of Richard Cloud and agree that the death penalty is clearly an appropriate punishment in this cause.
It is so ordered.
ENGLAND, C.J., and ADKINS, BOYD, OVERTON and SUNDBERG, JJ., concur.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] Florida courts have also been called upon to apply the Aguilar-Spinelli test. See, e.g., Findlay v. State, 316 So.2d 33 (Fla. 1975); State v. Smith, 233 So.2d 396 (Fla. 1970); St. John v. State, 356 So.2d 32 (Fla. 1st DCA 1978); Davis v. State, 350 So.2d 834 (Fla.2d DCA 1977), cert. denied, 355 So.2d 517 (Fla. 1978).
[3] Wilson and Henry are distinguishable from our decision in Greene v. State, 351 So.2d 941 (Fla. 1977). In Greene we did not address the applicability of McDole, but, instead, we discussed the issue of remand when voluntariness is not clear.
[4] Our holding in this matter is consistent with the new Florida Evidence Code, effective July 1, 1979. § 90.609, Fla. Stat. (Supp. 1978).
[5] In a federal prosecution arising from the murder of Cloud, the Fifth Circuit held that Haskew's false testimony concerning payment of attorney's fees did not require a new trial, because revelation of the fact that such fees were paid by the state would not reasonably have affected the judgment of the jury. See United States v. Antone, 603 F.2d 566 (5th Cir.1979).