EN BANC
PER CURIAM.
Wyon Dale Childers appeals his convictions for bribery and unlawful compensation or reward for official behavior. The convictions at issue here arose from the Escambia County Commission’s purchase of property known as the “Elliot Property” or the Pensacola Soccer Complex. Appellant and Willie Junior were county commissioners who voted for the purchase, *89 and Joe Elliot was the owner of the property. The State alleged that Appellant made a series of payments to Junior in return for Junior’s vote to acquire the property and that Appellant and Junior voted to purchase the property to receive kickback payments from Elliot. Junior became a state witness against Elliot and Appellant, after the State and Junior entered into a plea agreement in exchange for Junior’s truthful testimony.
Appellant challenges the trial court’s rulings excluding the admissibility at trial of the State’s attempt to revoke a plea agreement with Willie Junior, a key witness who testified at length against Appellant; the jury verdict acquitting Elliot; and the State’s original indictment filed against Appellant. The State cross-appeals the trial court’s rulings which excluded evidence that Appellant participated in another attempt to obtain county funding for a land purchase and which declined to order Appellant to pay restitution to Es-cambia County for losses incurred after, selling the soccer complex. Concerning the issues raised on appeal, we conclude that, although thp trial court erred in its conclusion that the Stage’s attempt to revoke Willie Junior’s -plea agreement was irrelevant, the 'evidence was properly excluded under section 90.403, Florida Statutes (2002), because the limited probative value of this evidence was substantially outweighed by the danger of unfair prejudice. We therefore affirm the trial court’s ruling under the so-called “tipsy coachman” rule. In addition, we affirm the trial court’s rulings excluding the Elliot verdict and any evidence regarding the State’s original indictment of Appellant. We reverse the restitution issue raised in the State’s cross-appeal and decline to address the evidentiary issue raised on cross-appeal.[1]
I. Background
A grand jury initially returned an indictment against Appellant charging him with one count each of money laundering, bribery, and unlawful compensation or reward for official behavior. At the time of the alleged unlawful activity, both Appellant and Junior served as Escambia County Commissioners. The State alleged that Appellant made a series of payments to Junior in return for Junior’s vote in favor of acquiring the Pensacola Soccer Complex. According to the State, Appellant and Junior stood to receive kickbacks from the owner of the soccer complex, Joe Elliot, upon the County’s purchase of the property. Elliot, Appellant, Junior, and others faced charges as a result of these allegations.
Several months before either Elliot or Appellant went to trial, Junior entered into a plea agreement with the State. Under the terms of his plea agreement with the State, Willie Junior pled nolo contendere to numerous charges, including bribery, and agreed to testify truthfully and completely regarding Elliot and Appellant’s involvement in the commission’s purchase of the soccer complex. In exchange, the State agreed that if Junior complied with the plea terms, it would “recommend a sentence no greater than eighteen months state prison,” rather than the approximately 125 year maximum sentence. The State reserved the right to make a sentencing recommendation based on its determination that Junior had “provided substantial *90 assistance in the investigation or prosecution of other persons who have committed offenses.” The agreement vested the state attorney with “sole discretion” in determining whether Junior had provided this assistance.
Junior fulfilled his obligation to testify against Elliot in his December 2002 trial. During that trial, the defense attacked Junior’s credibility. The jury ultimately acquitted Elliot of charges flowing from the soccer complex transaction. After the Elliot acquittal, in January 2003 Junior met with a State investigator and provided new information regarding Appellant’s involvement in the alleged bribery scheme which differed substantially from certain information provided by Junior in .previous statements. The primary matters about which Junior’s January 2003 statements differed from prior statements concerned a note upon which Appellant had written “100/100;” Appellant’s presentation of a cooking pot filled with money to Junior; and Appellant’s statement indicating that he was “sick and tired of not being able to get three votes.” Junior’s revised statements regarding each of these events included new details tending to more fully show culpability on Appellant’s part. Initially, Junior maintained that Appellant had written “100/100” on a notepad and passed it to Junior. According to Junior’s earlier statements, Appellant had made no statements regarding the meaning of the note, but Junior took it to mean that they would each receive $100,000 if the soccer complex deal went through. In the January 2003 statements, Junior claimed for the first time that the passing of the note was accompanied by Appellant’s direct statement that “if the soccer complex goes through, it will be a hundred for you and a hundred for me.” Additionally, Junior changed his story as to when the 100/100 note incident took place. Before his January statements, Junior maintained that the incident occurred after the commission voted to appraise the soccer complex property but before it voted to purchase it. In the revised statement, Junior said that Appellant gave him the note before the appraisal vote. He also added that Appellant stated, some time after the 100/100 note incident, that he was going to send Elliot to see Junior.
Similarly, Junior’s January 2003 statements supplied previously absent commentary describing an incident where Appellant allegedly gave Junior a large cooking pot filled with money. In past statements, Junior had maintained that Appellant tendered a money-filled pot without speaking a word. In the January 2003 statement, however, Junior recalled that Appellant mentioned that he took $25,000 out of the pot. Later, Junior added further to his description by stating that Appellant told him that he took the $25,000, as well as another $10,000, from the pot.
In January 2003, Junior also recalled Appellant’s alleged lamentation that he was “sick and tired of not being able to get three votes” (on the five-member commission). Apparently, Junior did not recall Appellant making such a statement until his meetings with the state investigator in January 2003. During the January meetings, Junior stated that Appellant had made this statement as early as May 2001. When asked more about this newly added detail, Junior recalled that Appellant made the statement at the time he passed Junior the 100/100 note.
After Junior provided this new information, the state attorney filed a “Notice of Revocation of Terms of Plea Agreement” in Junior’s criminal case. The State asserted that Junior had failed to comply with the agreement by changing his testimony, failing to earlier give complete *91 statements, and other allegations. The State asserted that
Mr. Junior has failed to disclose, in a timely manner, relevant, crucial and material information needed by the State of Florida in preparation of its cases, and thus, has provided inconsistent statements as to key events. Such failures and/or inconsistencies have resulted in damage to the State of Florida’s prosecution of various defendants.
The State concluded by announcing its revocation of Junior’s plea agreement.
Notwithstanding the state attorney’s apparent plenary power to revoke the plea agreement under its terms, the trial court granted a hearing at which Junior’s counsel argued that Junior had substantially complied with the terms of the agreement. The trial court agreed with Junior, ruling:
According to the terms of the plea agreement, the defendant [Junior] was required to testify truthfully; however, there is no evidence in the record ... that Mr. Junior was to testify truthfully to. Said in another way, there is nothing in the plea agreement that Mr. Junior must testify truthfully in a certain way so as to be clear as exactly what benefit the State expects to receive. Further, the written plea agreement states that Mr. Junior was to testify truthfully and completely, a subjective test at best. The statements he made on January 17th and 31st with State Attorney investigators, even if materially different from other statements and information previously given, were not under oath at a trial or hearing, and it does not indicate anything other than his willingness to assist the state in accordance with the plea agreement. Finally, the state ... acquiesced that Mr. Junior had consistently maintained and testified to certain material evidence. In conclusion, the Court [finds] that there has been substantial compliance with the written plea agreement, and for that reason, the State is without basis, at this time, to revoke it.
Following the trial court’s ruling, the State replaced the original indictment against Appellant with an information that was later amended. The new information against Appellant included the additional information provided by Junior.
Appellant then filed a notice indicating his intention to introduce as evidence: the State’s revocation notice; party opponent statements (by the state attorney) from Elliot’s trial; and party opponent statements from the revocation notice hearing. On March 31, 2003, the trial court heard arguments on this notice and several other relevant motions filed by the State and defense. In addition to the items listed in his notice, Appellant sought to introduce the original indictment to highlight the changes incorporated by the State in its amended information after Junior changed his story. For its part, the State argued in support of its motion in limine seeking to exclude the verdict in the Elliot case.
Appellant also filed a motion in limine to exclude the trial court’s order denying the State’s attempt to revoke the plea agreement. Appellant argued that the order finding Junior had complied with his plea agreement was irrelevant and would constitute “improper bolstering.” In addition, Appellant argued that the order’s “probative value, if any, is substantially and overwhelmingly outweighed by the unfair prejudice.” Thus, Appellant sought to have the jury hear only the State’s accusations that Junior’s later statements were not truthful and complete, and not a judicial ruling finding the State’s accusations without merit.
The trial court excluded all evidence related to the State’s attempted revocation of Junior’s plea agreement, as well as the *92 original indictment against appellant. The court found this evidence irrelevant to the State’s case against appellant. The judge also observed that, if the State’s attempt to revoke the agreement was admitted, the State would be allowed to establish that the judge found Junior in compliance with his plea agreement. In addition, the trial court also excluded the Elliot verdict finding, “among other things ..., the prejudice would outweigh any probative value.”
Appellant’s case proceeded to trial. Junior testified consistently with the version of events he had related in January 2008. Although denied the opportunity to attack Junior’s credibility through reference to the revocation proceedings and the Elliot acquittal, Appellant’s defense counsel was allowed to impeach Junior with prior inconsistent statements.
At trial, Junior testified that, before the payment, Appellant wrote out the 100/100 note and said he and Junior would each receive $100,000 for voting for the purchase of the land. Junior also testified that Appellant gave Junior a cooking pot of money, purportedly including $100,000, less $25,000 which Appellant retained for some loan repayments and other considerations. The jury heard other evidence related to Appellant’s alleged bribery of Junior, including a $40,000 payment from Appellant to Junior by cashier’s check that occurred when Junior traded some of the currency back to Appellant for a check. Junior testified that he also received separate checks from Appellant in the amounts of $7,000, $10,000, $11,000, and $3,000, respectively. Junior acknowledged that Appellant wrote notations on the checks that the payments were loans to Junior, and that he ultimately signed a promissory note in the principal amount of $87,000 in favor of Appellant. Junior testified, however, that Appellant never attempted to obtain repayment or security and that Appellant stated he would not attempt to collect the purported loans.
Appellant’s counsel vigorously cross-examined Junior regarding Junior’s plea agreement with the State and other related matters. The cross-examination continued for approximately 10 hours. During cross-examination, Appellant’s counsel impeached Junior with his prior inconsistent statements. Junior also admitted, among other things, that he had initially borrowed $10,000 from Appellant to pay a tax debt; that he had further signed an agreement to transfer to Appellant the funeral home owned by Junior; that Appellant could not enforce the loan agreement, as any security was encumbered; and that he had no intention of paying Appellant any money. Junior stated that it would likely be a futile gesture for Appellant to attempt to sue on any of the agreements. Appellant’s cross-examination concluded with questions regarding Junior’s use of the money provided by Appellant.
On redirect examination, Junior testified that he was more concerned with making money from his vote on purchasing the soccer complex than whether the purchase was good for the county and that his vote was bought by Appellant. He stated that he thought Appellant wrote the 100/100 note before Junior had added the appraisal of the soccer complex to the commission agenda and that he signed the promissory note to Appellant after Appellant gave Junior a $7,000 check on December 28, 2001. According to Junior, Appellant never tried to collect on the note. Junior testified that there was approximately $180,000 in equity in his funeral home, but that Appellant did not attempt to use legal recourse to collect his loans.
Appellant’s counsel was allowed to recross examine Junior for limited questions. Counsel established that Junior had attempted to sell his funeral home for years. *93 Junior also acknowledged that the soccer complex was appraised for the value of the purchase price. Junior was recalled again to testify that he returned the pot allegedly containing the bribe to Appellant.
State Attorney Investigator Allen Cotton testified regarding phone logs and other matters. Appellant’s counsel also vigorously cross examined Cotton, who acknowledged that Junior had given inconsistent testimony. On cross-examination, Cotton acknowledged that Junior had “given more information during this investigation” in response to the question “There is no question that he’s changed his story on various matters along the way, is there?” Cotton conceded the following:
Q: Did you agree with me that he’s changed his testimony about different things?
A: I would say there are some inconsistencies at issue.
Q: And the parties agreed under this agreement, that the state may revoke the agreement in the sole discretion of the State Attorney [if] any of the following circumstances have occurred.
Junior’s refusal to cooperate by this agreement, right?
A: That’s correct.
Q: His statements are incomplete or untruthful, correct?
A: That’s the way it reads, yes sir.
Q: By the way, an incomplete statement means, one, where the witness does not give the full story about something, that’s incomplete?
A: Yes sir, I believe that loould be a correct summary.
[Emphasis supplied.]
During Appellant’s case, Appellant’s counsel called Cotton to testify regarding Junior’s inconsistent statements and Cotton’s statements that the changes in Junior’s statements would be a “problem.” On cross-examination, the State elicited testimony that Junior had always been consistent regarding the fact that Appellant wrote the “100/100” note and that Junior had received money from Appellant placed in a pot. Investigator Hughes also testified during Appellant’s case that Junior provided different descriptions of the alleged pot, once describing the item as a “bucket.”
During its case-in-chief, the State sought to introduce evidence of another real property transaction involving Appellant, Junior, and Elliot. In that transaction, referred to below as the Jack Lee Buick deal, the three men allegedly worked together to have the County purchase an unneeded parcel of property. The State sought to show that Elliot, as the listing agent for the property, would have earned a substantial commission on the sale of this real property to the County, which, in turn, he would share with Appellant and Junior. The trial court chose to exclude the evidence finding no “similar fact evidence or occurrences which would make such evidence relevant, and, therefore, admissible in this cause.” The court also found that “any probative value that could be determined would be outweighed by far, as far as the Court is concerned, by the prejudices that it would cause.”
The jury found Appellant guilty of bribery and unlawful compensation or reward for official behavior, and not guilty of the money laundering charge. Because Es-cambia County incurred a loss of nearly $1 million in purchasing the soccer complex and later selling it, the State sought an award of restitution to the County. The trial court denied restitution, concluding that the County was not a “victim” entitled to restitution as defined by section 775.089(l)(a), Florida Statutes (2002).
*94 II. Analysis
We apply the abuse of discretion standard of review in reviewing the trial court’s decision to exclude the evidence with which Appellant sought to attack Junior’s credibility. See Heath v. State, 648 So.2d 660, 664 (Fla.1994); Reed v. State, 783 So.2d 1192 (Fla. 1st DCA 2001). The “trial court’s discretion is limited by the rules of evidence.” Sybers v. State, 841 So.2d 532, 545 (Fla. 1st DCA 2003) (quoting Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001)). Under the rules of evidence, Appellant could attack Junior’s credibility by “showing that a witness is biased.” § 90.608(2), Fla. Stat. (2002). The relevancy standards of section 90.401 and section 90.403 limit the scope of evidence available to show Junior’s bias. Section 90.401 defines relevant evidence as that evidence “tending to prove or disprove a material fact.” Under section 90.403, “[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice.” In this case, the trial court’s rulings were based upon findings that the excluded evidence was either irrelevant or of insufficient probative value when weighed against the danger of unfair prejudice.

A. The Junior Plea Agreement

When Appellant sought to introduce into evidence the State’s attempted revocation of Junior’s plea agreement, the trial court based its exclusion of this evidence on a finding that the evidence was irrelevant. We conclude that the trial court erred in ruling this evidence irrelevant. Although the reason stated by the trial court for excluding this evidence was erroneous, “if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record.” Dade County School Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla.1999). “[Tjhere must have been support for the alternate theory or principle of law in the record before the trial court.” Robertson v. State, 829 So.2d 901, 907 (Fla.2002). This principle, referred to as the “tipsy coachman” rule, see Home Depot U.S.A. Co., Inc. v. Taylor, 676 So.2d 479, 480 (Fla. 5th DCA 1996), arises from the presumption of correctness with which the judgment of the trial court is clothed. See Cohen v. Mohawk, Inc., 137 So.2d 222, 225 (Fla.1962). In our view, the record here supports affirmance on a theory different than that adopted by the trial court. See Applegate v. Barnett Bank, 377 So.2d 1150, 1152 (Fla.1979) (“The written final judgment by the trial court could well be wrong in its reasoning, but the decision of the trial court is primarily what matters, not the reasoning used. Even when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it.”); Muhammad v. State, 782 So.2d 343, 359 (Fla.2001)(“[T]he trial court’s ruling on an evidentiary matter will be affirmed even if the trial court ruled for the wrong reasons, as long as the evidence or an alternative theory supports the ruling.”).
Section 90.403, Florida Statutes (2002), provides:
Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
“Almost all evidence introduced during a criminal prosecution is prejudicial to a defendant.” Williamson v. State, 681 So.2d 688, 696 (Fla.1996). In reviewing whether *95 evidence is inadmissible under section 90.403, “a trial judge must balance the import of the evidence with respect to the case of the party offering it against the danger of unfair prejudice. Only when the unfair prejudice -substantially outweighs the probative value of the evidence should it be excluded.” Id. As Professor Eh-rhardt explains:
Most evidence that is admitted will be prejudicial or damaging to the party against whom it is offered. Section 90.403 does not bar this evidence; it applies to evidence which is directed to an improper purpose, such as evidence that inflames the jury or appeals improperly to the jury’s emotions or that an accused committed the charged crime because of evidence of the bad or evil character of the accused. Only when that unfair prejudice substantially outweighs the probative value of the evidence is the evidence excluded.
Charles Ehrhardt, Florida Evidence, § 403.1 at 163-64 (2004 ed.)(footnotes omitted).
We recognize that the State’s notice to revoke could have forced Junior to believe it was in his best interest to testify consistently with his latest and most detailed version of events. The attempted revocation of Junior’s plea agreement, however, was of limited probative value for several reasons. First, the evidentiary impact of the notice was reduced substantially when the trial court ruled that Junior had complied with the plea agreement and denied the attempted revocation. Certainly, as the trial court stated when ruling on the inadmissibility of the notice of revocation, if the notice to revoke were admitted into evidence, the trial court’s order denying the motion would be allowed into evidence as well.
This court has recognized that the balancing test for excluding evidence under Section 90.403, Florida Statutes, requires that a court carefully evaluate the probative value of the evidence to the party favoring admission, and compare this to the unfair prejudice to the party opposing admission. Marchina v. State, 702 So.2d 1369 (Fla. 1st DCA 1997). In Marchina, a defendant facing sexual-battery charges mentioned on direct examination that he had “trouble” before with law-enforcement officers, explaining why he left a trailer park when he saw law enforcement officers. The trial court allowed the prosecutor to cross-examine Marchina on this statement and force his admission that the previous “trouble” included a prior arrest on unrelated charges involving “little girls.” On appeal, this court agreed with the Marchina defendant that this evidence should be excluded under section 90.403, Florida Statutes.
One factor crucial to this court’s decision in Marchina was that the evidence in question “had very little legitimate probative value for the prosecution.” Id. This limited legitimate probative value was outweighed by the unfair prejudice caused by the focus of the evidence on the defendant’s “bad character” or “propensity,” prohibited by Section 90.404, Florida Statutes. Similarly here, as noted above, the evidence in question actually had little probative value in Appellant’s defense, as its admission would have resulted in the jury hearing that the trial court had found Junior to be in compliance with his agreement to testify “truthfully.” This, no doubt, explains why Appellant attempted to exclude the trial court’s ruling. We further note that, like the evidence in Marchina, an arrest in another case, the evidence which Appellant attempted to admit here involved another proceeding, Junior’s criminal case. As was the case with the evidence in Marchina, here the limited probative value of the State’s No *96 tice to Revoke was far outweighed by unfair prejudice to Appellant himself and the State.
Second, from the testimony of both Investigator Cotton and Junior, the jury learned that the State could revoke Junior’s plea agreement if he did not testify truthfully. Thus, the notice would serve merely to emphasize facts already in evidence.
Finally, Appellant’s counsel vigorously and extensively cross-examined Junior on his plea agreement and the State’s right to revoke the agreement if Junior failed to testify truthfully. As noted above, defense counsel ably demonstrated to the jury that Junior had changed his testimony by January 2003. For example, the following exchanges occurred during the defense cross examination of Willie Junior:
Q. So let’s talk about some of the responsibilities and benefits to both sides of that [plea] agreement. Okay? All right?
A. Go ahead.
* * *
Q. Now, you agreed in this plea agreement to give truthful information to the State Attorney; correct?
A. That’s correct.
* * *
Q. On the very first page [of the plea agreement] in yellow, it says, it’s underlined: “However, if any information Junior provides is determined to be false, this grant of immunity is withdrawn, and, additionally, the state may prosecute Junior for offenses relating to the giving of false statements or perjury”; right?
A. Right.
Q. So you knew that provision to mean that if the state felt that you had testified falsely or given false information, the deal would be off, or could be, the immunity would be off for the other offenses that you may have committed, and you could be prosecuted for something like perjury, right, that’s what it meant?
A. Right.
[[Image here]]
Q. Okay. Now you were asked by Mr. Simon on direct examination about what you’re looking at here, and under the terms of the agreement, you testified that you’re now looking at a maximum sentence of 18 months in prison for these ten felonies; right?
A. That’s correct.
Q. But there is no bottom to what you could get; right? In other words, you could get 17 months, you could get zero, you could get probation; right?
A. That would be up to the judge.
Q. Right. And you hope you do; right?
A. Wouldn’t you?
[[Image here]]
Q. So, let’s talk about what the truth does mean to you then. All right? Because that’s really the essence of your obligations under the agreement, because if you don’t fulfill the agreement, all deals are off; right?
A. That’s correct.
Q. In other words, if the state decides — if you lie under this agreement, you can be prosecuted— you’re not looking at 18 months anymore, you’re looking at 125 years; right?
A. I don’t know the exact number, but if you lie, you have to deal with the *97 consequences, what the lie was about.
Q. And not only could you be charged with perjury, but the immunity provisions go away; right?
A. I would think so.
(Emphasis added). Thus, the jury was well aware of the plea agreement, the State’s ability to revoke it, and Junior’s motivation to cooperate created by the threat of revocation. The introduction of the notice to revoke and the order denying the motion would have added little of probative value to what the jury had before it.
On the other hand, the introduction of the notice to revoke would have been highly prejudicial. The admission of the notice would have been similar to admitting an opinion by the State concerning Junior’s character, truthfulness, and credibility. Such opinion testimony regarding a witness’ reputation for truthfulness is clearly inadmissible. See Antone v. State, 382 So.2d 1205, 1213-14 (Fla.1980) (holding improper a question of a witness which sought “to elicit the individual and personal view of the witness.”); Hernandez v. State, 575 So.2d 1321, 1322 (Fla. 4th DCA 1991) (holding that it was reversible error to admit testimony of police officers and teacher that sexual abuse victim was truthful. “A witness invades the jury’s exclusive province when that witness gives his or her personal views of the credibility of another witness.”); Alvarado v. State, 521 So.2d 180, 181 (Fla. 3d DCA 1988) (holding that an opinion of a witness concerning his or her belief as to the truthfulness of another witness “was clearly inadmissible.”); Morrison v. State, 818 So.2d 432, 451 (Fla.2002) (holding that it was improper to allow personal opinion to establish reputation for truthfulness without laying a foundation based on knowledge of the witness’ reputation in community for truthfulness); Wyatt v. State, 578 So.2d 811, 813 (Fla. 3d DCA 1991) (holding that section 90.405, Florida Statutes, does not permit opinion testimony regarding evidence of character); Ehrhardt, Florida Evidence § 405.2 at 258 (“Opinion testimony concerning a person’s character has traditionally been inadmissible on the basis that it is too unreliable; it will be tainted by the underlying prejudice and bias of the person expressing the opinion.”)(footnote omitted). In our view, the type of testimony sought to be introduced by Appellant was likely to distract the jury during their deliberations; improperly influence the jury’s evaluation of Junior’s veracity, where the credibility of his testimony was a central issue; and prejudice the State’s case with unreliable evidence. Because the prejudice to the State that would be created by the admission of the notice to revoke substantially outweighs the very limited probative value of this evidence, the notice was excludable under section 90.403, Florida Statutes.

B. The Elliot Verdict and the Original Indictment

In addition to his attempt to introduce the State’s Notice to Revoke Junior’s plea agreement in Junior’s criminal case, Appellant moved the trial court to admit the Elliot acquittal in Appellant’s trial. We agree with the trial court that the Elliot verdict was not admissible in Appellant’s criminal trial. Verdicts from other cases are generally inadmissible. Secada v. Weinstein, 563 So.2d 172 (Fla. 3rd DCA 1990). The trial court did not abuse his discretion in excluding this evidence.
We further agree that the trial court did not abuse its discretion in excluding the state’s original indictment of Appellant. A comparison of the amended information to the original indictment demonstrates, at best, additional details of *98 the same charges. The probative value of the indictment, with regard to Junior’s credibility, is far too attenuated to support a conclusion that the trial court abused its discretion in excluding the instrument. Moreover, under section 90.403, the trial court may, and did, properly guard against undue prejudice, in particular, any suggestion that the prosecution did something wrong or unfair by amending the charges.

C. The Jack Lee Buick Deal

The State cross-appeals the trial court’s ruling excluding this evidence under section 90.404, Florida Statutes. Because we affirm Appellant’s convictions, we decline to review this issue.

D. Restitution

The State argued below for restitution, noting that Escambia County suffered a loss of nearly $1 million when it sold the soccer complex after the commission’s purchase. The trial court denied restitution, ruling that Escambia County was not a “victim” as that term is used in section 775.089, Florida Statutes (2002).
Section 775.089(1) mandates an award of restitution to victims. Section 775.089(l)(c) defines a “victim” as a “person who suffers property damage or loss, monetary expense, or physical injury or death as a direct or indirect result of the defendant’s offense or criminal episode ....” (emphasis added). Section 1.01(3), Florida Statutes (2002), defines “person,” as follows:
The word “person” includes individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.
(emphasis added). The appellant argued below and argues on appeal that, since Escambia County is a political subdivision of the state, rather than a “person” as defined in section 1.01(3), section 775.089 does not authorize a restitution award in favor of the county. We do not agree, reverse the denial of restitution, and remand for further proceedings.
In section 1.01(3), the legislature has defined “person” by providing a list of people and entities each of which is deemed a “person.” Because “person” “includes” the list of individuals and entities, we conclude that the legislature did not intend this list to be a limiting and exhaustive definition of the term. In standard usage, the use’ of the term “include” does not indicate that a list of subjects is exhaustive. Blacks Law Dictionary 766 (7th ed.1999) defines “include” in pertinent part, as follows:
include, vh. To contain as a part of something. The participle including typically indicates a partial list <the plaintiff asserted five tort claims, including slander and libel >....
Similarly, the author Bill Bryson explains that “include indicates that what is to follow is only part of a greater whole. To use it when you are describing a totality is sloppy....” Bill Bryson, Troublesome Words 101 (3d ed.2001). If the statute provided that “person” included “only” those individuals and entities specifically mentioned in the statute, or defined “person” using the more exhaustive word, such as “means,” we would agree with the appellant’s argument. By the use of the non-limiting term “includes,” however, the list used to define “person” is illustrative rather than exhaustive. See, e.g., Matter v. Krehl, 86 F.3d 737, 741 (7th Cir.1996); Standard Oil Co. of Calif. v. Federal Trade Comm’n, 596 F.2d 1381, 1384 (9th Cir.1979), rev’d on other grounds, 449 U.S. 232, 238 n. 7, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980); Toombs v. City of Champaign, 245 *99 Ill.App.3d 580, 185 Ill.Dec. 755, 615 N.E.2d 50, 52 (1993).
In considering whether Escambia County is a “person” in the context of section 775.089(1), we also find persuasive the Second District’s reasoning in South Florida Water Mgmt. Dist. v. Layton, 402 So.2d 597 (Fla. 2d DCA 1981). In Layton, the plaintiff sought to establish a statutory way of necessity pursuant to section 704.01(2), Florida Statutes (1979). Section 704.01(2) provided for a statutory way of necessity under certain defined circumstances where land is “shut off or hemmed in by lands, fencing, or other improvements of other persons. ...” (emphasis added). The Water Management District argued that it was not a “person” under section 704.01(2), because a body politic is not included within the definition of “person” in section 1.01(3), Florida Statutes (1979). Holding that the Water Management District was a “person” under 704.01(2), the Layton court explained:
Appellant contends that section 704.01 does not apply to it because it is not a “person” within the intendment of the statute and sovereign immunity has consequently not been waived. Chapter 704 does not define the word “person.” Consequently, appellant urges, chapter 1, which contains definitions for construction of all statutes where context permits, is therefore applicable. “Person” is defined in section 1.01(3) to include “individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.” A separate definition exists for “public body,” “body politic,” or “political subdivision,” which are defined as including: “counties, cities, towns, villages, special tax school districts, special roads and bridge districts, bridge districts and all other districts in this state.” Thus, for purposes of chapter 704, appellant concludes, a special district is not a “person.” We disagree. Under the express provisions of section 1.01, the definitions contained therein apply only where the context permits. Had section 704.01 made a distinction between “persons” and “public bodies,” “bodies politic,” or “political subdivisions,” we would agree with appellant. However, section 704.01 makes no such distinction, and we see no basis for necessarily assuming the legislature intended one here. For the reasons set forth below, we conclude that the legislature intended to include the state and its agencies within the meaning of “persons” as used in section 704.01.
Layton, 402 So.2d at 598; see also City of Gainesville v. State, Dep’t of Transp., 778 So.2d 519, 528 n. 5 (Fla. 1st DCA 2001)(Department of Transportation is a “person” within meaning of section 180.13(2), Florida Statutes (2000)).
Further, in chapter 960, Florida Statutes (2002), we find unmistakable legislative intent that a county is entitled to restitution pursuant to section 775.089(1). In authorizing the imposition of civil restitution liens, the Florida Legislature expressed its intention to “enable crime victims, the state, and other aggrieved parties to recover damages and losses arising out of criminal acts .... ” § 960.29(l)(a), Fla. Stat. (2002). Most significantly, the legislature further provided, that “[njotwith-standing this civil restitution lien act, the crime victim, the state and its local subdivisions, or other aggrieved parties are not precluded from collecting ... moneys awarded by a restitution order under s. 775.089. ...” § 960.295(2), Fla. Stat. (2002)(emphasis added).
Finally, reading section 1.01(3) to exclude a governmental unit from recovering *100 restitution as a victim, under a statute in which the crime victim is referred to as a “person,” would lead to absurd results. Several criminal statutes refer to crime victims by use of the term “person.” See, e.g., §§ 831.01, 831.02, 831.07, 831.09, Fla. Stat. (2002). By its use of the term “person” in these .statutes, the legislature obviously did not intend to insulate from criminal responsibility those persons who victimize Florida counties through commission of the acts proscribed by these statutes. Indeed, legislative intent to include counties within the term “person” when the term is used to refer to a crime victim was recognized by the Florida Supreme Court more than a century ago in Darby v. State, 41 Fla. 274, 26 So. 315 (1899).
The cases on which appellant relies, Lewis v. State, 874 So.2d 18, 20 (Fla. 4th DCA 2004); Jones v. State, 846 So.2d 662, 662-63 (Fla. 2d DCA 2003); Sheppard v. State, 753 So.2d 748 (Fla. 2d DCA 2000); and Sims v. State, 746 So.2d 546 (Fla. 2d DCA 1999), do not address the issue raised here: whether a county is barred from entitlement to restitution pursuant to section 775.089 because it is not a “person.” In each of these cases, the court recognized that section 775.089 did not allow restitution to a governmental entity for investigative, prosecutorial, or supervisory costs relating to the prosecution of the defendant because these expenses do not constitute the type of loss necessary to make the entity a “victim” within the meaning of the statute. We have no disagreement with the holdings in these cases. Unlike the case before us, however, none of these cases involved losses incurred as a result of the defendant’s criminal activity. Where a governmental entity incurs financial losses because it is the victim of the defendant’s criminal activity, rather than incurring costs relating to investigation, supervision or prosecution, we hold that restitution is recoverable.
DAVIS, VAN NORTWICK, PADOVANO, LEWIS, HAWKES and THOMAS, JJ., concur.
ALLEN, J., concurs with written opinion in which DAVIS, VAN NORTWICK, PADOVANO, LEWIS, HAWKES, and THOMAS, JJ., concur.
THOMAS, J., specially concurs with written opinion in which HAWKES, J., concurs.
KAHN, C.J., concurs in part and dissents in part with written opinion in which ERVIN, J. concurs and WOLF, BROWNING and POLSTON, JJ., concur in part.
ERVIN, J., concurs in part and dissents in part with written opinion in which KAHN, C.J. concurs and WOLF, J., concurs in part.
WOLF, J., concurs in part and dissents in part with written opinion in which KAHN, C.J., and ERVIN, J., concur in part.
WEBSTER, J., concurs in part and dissents in part with written opinion in which ERVIN, J., concurs in part.
BENTON, J., concurs in part and dissents in part with written opinion.
BROWNING, J., concurs in part and dissents in part with written opinion in which ERVIN, J., concurs in part.
POLSTON, J., concurs in part and dissents in part with written opinion in which KAHN, C.J. and ERVIN and BROWNING, JJ. concur.

. As can be seen, in this case the judges of this court have differing views on the question of en banc consideration and the issues raised on the merits. Some judges concur with en banc consideration but dissent on the merits, while other judges dissent on en banc consideration but concur on the merits. Accordingly, in this opinion we address only the issues relating to the merits of the instant action.